No. 2013-1386

# United States Court of Appeals for the Federal Circuit

———————

TYCO HEALTHCARE GROUP LP AND MALLINCKRODT INC.,
PLAINTIFFS-APPELLEES

*v.*

MUTUAL PHARMACEUTICAL COMPANY, INC. AND UNITED RESEARCH
LABORATORIES, INC., DEFENDANTS-APPELLANTS

———————

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 2:07-CV-01299-SRC-CLW, JUDGE STANLEY R. CHESLER*

———————

**NONCONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLANTS**

———————

JAMES F. HURST
*Winston & Strawn LLP*
*35 West Wacker Drive*
*Chicago, IL  60601*
*(312) 558-5600*
*jhurst@winston.com*

STEFFEN N. JOHNSON
CHARLES B. KLEIN
*Winston & Strawn LLP*
*1700 K Street N.W.*
*Washington, D.C.  20006*
*(202) 282-5000*
*sjohnson@winston.com*
*cklein@winston.com*

*Counsel for Defendants-Appellants*

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants Mutual Pharmaceutical Company, Inc. and United Research Laboratories, Inc. certifies the following:

**1.     The full name of every party or amicus represented by me is:**

Mutual Pharmaceutical Company, Inc.

United Research Laboratories, Inc.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Mutual Pharmaceutical Company, Inc.

United Research Laboratories, Inc.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

URL Pharma, Inc.

Caraco Pharmaceutical Laboratories, Ltd.

Sun Pharmaceutical Industries, Ltd.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

*Winston & Strawn LLP*: James F. Hurst; Steffen N. Johnson; Charles B. Klein; James S. Richter; Jeffrey P. Catenacci

*Axinn, Veltrop & Harkrider LLP*: James D. Veltrop; Francis H. Morrison; Edward H. Mathias; Thomas K. Hedemann; Michael L. Keeley; Jeremy C. Lowe; James P. Doyle; Todd E. Brewer; Ithti T. Ulit

*Sterns & Weinroth, P.C.*: Karen A. Confoy; Erica S. Helms

*Fox Rothschild LLP*: Karen A. Confoy

Dated: JULY 5, 2013

/s/ Steffen N. Johnson
STEFFEN N. JOHNSON
*Winston & Strawn LLP*
*1700 K St., NW*
*Washington, DC 20006*
*(202) 282-5000*
*sjohnson@winston.com*

*Counsel for Defendants-Appellants*
*Mutual Pharmaceutical Company, Inc.*
*and URL Research Laboratories, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

GLOSSARY OF ABBREVIATIONS ....................................................ix

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF JURISDICTION......................................................1

INTRODUCTION .................................................................................1

STATEMENT OF THE ISSUES..........................................................7

STATEMENT OF FACTS AND OF THE CASE .................................8

    A.    Temazepam ...........................................................................8

    B.    Tyco's patents and the "specific surface area" limitation....................8

    C.    Mutual's ANDA and notice letter .......................................11

    D.    Infringement and validity proceedings in the district court ...............13

        1.    Tyco files suit.............................................................13

        2.    FDA's tentative approval of Mutual's ANDA ........................14

        3.    Mutual's initial motion for summary judgment.......................14

        4.    Mutual's request for leave to seek summary judgment............15

        5.    Tyco's effort to extend the stay .................................15

        6.    The expiration of the 30-month automatic stay, Tyco's unsuccessful request for a preliminary injunction, and the court's dismissal of Tyco's §271(e)(2) claim ..........................16

        7.    Tyco's citizen petition and FDA's denial thereof....................19

        8.    FDA's approval of Mutual's ANDA and Mutual's market entry..........................................................................20

i

# TABLE OF CONTENTS
## (continued)

Page

9.   Mutual's successful motion for summary judgment ...............20

E.   This Court's affirmance of summary judgment for Mutual...............21

F.   Antitrust and inequitable conduct proceedings below ......................22

1.   The district court's "sham litigation" ruling ............................23

2.   The district court's "*Walker Process* fraud" ruling .................25

G.   Entry of Consent Order of Final Judgment .........................................26

SUMMARY OF ARGUMENT ...............................................................................26

STANDARD OF REVIEW .....................................................................................30

ARGUMENT ...........................................................................................................30

I.   The district court erred in granting summary judgment to Tyco on Mutual's "sham litigation" claim. ...............................................................30

A.   Under *Elan*, a reasonable factfinder could conclude that Tyco's §271(e)(2) infringement claim was a sham.........................................31

1.   *Elan* establishes at least a factual dispute as to whether Tyco's §271(e)(2) claim was objectively baseless. .................32

2.   The district court's grounds for granting summary judgment in the face of *Elan* do not withstand scrutiny. .................36

B.   A reasonable fact-finder could further find that Tyco lacked a realistic prospect of success in defending its patent's validity. ..........40

II.   A reasonable factfinder could find that Tyco's citizen petition was a sham. ................................................................................................................44

A.   The district court failed to apply the proper legal standard. ...............44

B.   Ample evidence shows that Tyco's petition was objectively baseless. .................................................................................................45

## TABLE OF CONTENTS
### (continued)

Page

    C.    Ample evidence shows that Tyco filed the petition to prevent lawful competition from Mutual. .......................................................48

III.   The district court erred in granting summary judgment to Tyco on Mutual's *Walker Process* fraud claim. ...........................................50

    A.    The record shows that Sandoz committed fraud in procuring the Tyco patents. ......................................................................52

    B.    There is ample evidence from which a jury could infer that Tyco knew about Sandoz's fraud........................................................54

        1.    Actual knowledge may—and typically must—be proven by circumstantial evidence.......................................................55

        2.    The record shows that Tyco had access to the evidence of Sandoz's fraud and was on notice that the patents were "vulnerable to a validity challenge."........................................55

        3.    A reasonable factfinder could infer that Tyco knew of the fraud. ......................................................................58

CONCLUSION .....................................................................................60

## STATEMENT OF GENERAL NATURE OF REDACTED MATERIAL

Pursuant to Federal Circuit Rule 28(d)(1)(B), confidential information that is the subject of a protective order entered by the district court has been redacted in this brief. This information generally relates to the parties' research and development, regulatory approval, and internal business practices.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Torpharm, Inc.*,
300 F.3d 1367 (Fed. Cir. 2002) ................................................2-3, 27, 32, 34-35

*Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Memorial Hosp.*,
185 F.3d 154 (3d Cir. 1999) ..........................................................................44

*Bayer AG v. Elan Pharm. Res. Corp.*,
212 F.3d 1241 (Fed. Cir. 2000) ......................2-6, 9, 12, 14-18, 23-24, 27, 31-39

*Brown v. Owens Corning Inv. Review Comm.*,
622 F.3d 564 (6th Cir. 2010) ..........................................................................59

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
157 F.3d 1340 (Fed. Cir. 1998) ..................................................................42, 51

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*,
527 F.3d 1278 (Fed. Cir. 2008) .......................................................................13

*Cheek v. United States*,
498 U.S. 192 (1991).........................................................................................30

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999) .......................................................................44-45

*Conopco Inc. v. May Dep't Stores Co.*,
46 F.3d 1556 (Fed. Cir. 1994) .........................................................................40

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) .......................................................................53

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961).........................................................................................31

*Eli Lilly & Co. v. Medtronic*,
496 U.S. 661 (1990).........................................................................................32

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Farmer v. Brennan,*
   511 U.S. 825 (1994)..........................................................................58

*Frolow v. Wilson Sporting Goods Co.,*
   710 F.3d 1303 (Fed. Cir. 2013) .........................................................30

*Glaxo Inc. v. Novopharm Ltd.,*
   110 F.3d 1562 (Fed. Cir. 1997) .........................................................34

*Glenn Const. Co., LLC v. Bell Aerospace Servs., Inc.,*
   785 F. Supp. 2d 1258 (M.D. Ala. 2011)..............................................59

*Handgards, Inc. v. Ethicon, Inc.*
   ("*Handgards I*"), 601 F.2d 986 (9th Cir. 1979)..................................42

*Handgards, Inc. v. Ethicon, Inc.*
   ("*Handgards II*"), 743 F.2d 1282 (9th Cir. 1984) .............................43

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982)..........................................................................48

*In re Brimoninide Patent Litig.,*
   643 F.3d 1366 (Fed. Cir. 2011) .........................................................32

*In re DDAVP Direct Purchaser Antitrust Litig.,*
   585 F.3d 677 (2d Cir. 2009) .................................................44, 46, 49

*In re Flonase Antitrust Litig.,*
   795 F. Supp. 2d 300 (E.D. Pa. 2011).........................................45, 47

*In re Relafen Antitrust Litig.,*
   346 F. Supp. 2d 349 (D. Mass. 2004)................................................30

*Jordan v. Paul Fin., LLC,*
   285 F.R.D. 435 (N.D. Cal. 2012)........................................................59

*La. Wholesale Drug Co. v. Sanofi-Aventis,*
   2008 WL 4580016 (S.D.N.Y. Oct. 14, 2008)..............................47, 49

v

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Mallinckrodt, Inc. v. Masimo Corp.*,
   147 F. App'x 158 (Fed. Cir. 2005) ..............................................................60

*Nicini v. Morra*,
   212 F.3d 798 (3d Cir. 2000) ........................................................................30

*Nobelpharma AB v. Implant Innovations, Inc.*,
   141 F.3d 1059 (Fed. Cir. 1998) .................................................. 50, 51, 53-54

*Personnel Dept., Inc. v. Prof'l Staff Leasing*,
   297 F. App'x 773 (10th Cir. 2008) ........................................................26, 36

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993).......................................... 1, 6, 24, 26, 28-31, 34, 40, 44, 49

*Riehl v. Travelers Ins. Co.*,
   772 F.2d 19 (3d Cir. 1985) .........................................................................29

*SEB S.A. v. Montgomery Ward & Co.*,
   594 F.3d 1360 (Fed. Cir. 2010) ............................................................55, 60

*Staples v. United States*,
   511 U.S. 600 (1994)....................................................................................55

*Stewart v. Sonneborn*,
   98 U.S. 187 (1878).......................................................................................30

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) .................................................................42

*Synqor, Inc. v. Artesyn Techs., Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013) .................................................................55

*Teva Pharms. USA, Inc. v. Abbott Labs.*,
   580 F. Supp. 2d 345 (D. Del. 2008)............................................................40

*Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*,
   642 F.3d 1370 (Fed. Cir. 2011) ... 1, 5, 8-10, 18, 20-22, 28, 34, 37, 41-43, 52, 54

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Santos*,
   553 U.S. 507 (2008)..........................................................................55

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
   375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394
   (2006) ...............................................................................................50

*Walker Process Equip., Inc. v. Food Machinery Corp.*,
   382 U.S. 172 (1965)..................................................1, 6-7, 23, 25, 29, 50-52, 54

*Wanlass v. Gen. Elec. Co.*,
   148 F.3d 1334 (Fed. Cir. 1998) .........................................................54

## STATUTES

21 U.S.C. § 331(d) ................................................................ 15, 33, 37-38

21 U.S.C. § 355(j)(2)(A)(vii)(IV).........................................................11

21 U.S.C. § 355(j)(5)(B)(iii) ................................................................13

21 U.S.C. § 355(j)(5)(B)(iii)(I)............................................................32

21 U.S.C. § 355(j)(5)(B)(iii)(II)...........................................................32

21 U.S.C. § 355(j)(5)(B)(iii)(III) .........................................................32

28 U.S.C. § 1295(a)(1)...........................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1338 .....................................................................................1

35 U.S.C. § 271(a) ................................... 4, 13, 16, 20, 23, 31, 35, 37-39

35 U.S.C. § 271(b) ................................................................................13

35 U.S.C. § 271(c) ................................................................................13

35 U.S.C. § 271(e)(2)............................. 2-5, 7, 16, 20, 23, 26-27, 31-35, 37, 39, 40

# TABLE OF AUTHORITIES
## (continued)

**Page**

35 U.S.C. § 271(e)(2)(A) ............................................................13, 18, 31

35 U.S.C. § 271(e)(4).................................................................13

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* ¶705k.........................................54

Fed. R. Civ. P. 52(c)....................................................... 17, 18, 24, 36-37

Fed. R. Civ. P. 56(a)................................................................30

U.S. Const. amend. I ...............................................................30

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ANDA | Abbreviated New Drug Application |
| API | Active Pharmaceutical Ingredient |
| BNF | British National Formulary |
| FDA | Food & Drug Administration |
| $m^2/g$ | square meters per gram |
| mg | milligrams |
| Mutual | Defendants-Appellants Mutual Pharmaceutical Company, Inc. and United Research Laboratories, Inc. |
| NDA | New Drug Application |
| Orange Book | FDA Approved Drug Products With Therapeutic Equivalence Evaluations |
| PTO | Patent and Trademark Office |
| Tyco | Plaintiffs-Appellees Tyco Healthcare Group LP and Mallinckrodt Inc. |
| §271(a) | 35 U.S.C. §271(a) |
| §271(e)(2) | 35 U.S.C. §271(e)(2) |
| R&D | Research & Development |
| SSA | Specific Surface Area |

## STATEMENT OF RELATED CASES

This Court earlier unanimously affirmed the district court's judgment that a patent at issue is invalid. 642 F.3d 1370 (Fed. Cir. 2011).

## STATEMENT OF JURISDICTION

This is an appeal from a final order of the District of New Jersey. A1-2. Defendants-Appellants (collectively, "Mutual") timely noticed this appeal on May 1, 2013. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## INTRODUCTION

The district court granted summary judgment despite sharply disputed factual issues under two antitrust doctrines that complement the patent law. The first doctrine is the "sham litigation" exception to *Noerr-Pennington* immunity—an exception providing that a party's patent infringement lawsuit is not "immune from antitrust liability" if the claims were "objectively baseless" in the sense that "no reasonable litigant could realistically expect to secure favorable relief." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62 (1993) ("*PRE*"). The second is the "*Walker Process* fraud" doctrine—which provides that "enforcement of a patent procured by fraud on the PTO may be violative of §2 of the Sherman Act." *Walker Process Equip., Inc. v. Food Machinery Corp.*, 382 U.S. 172, 174 (1965).

1

Plaintiffs ("Tyco") sued to enforce four patents that claim "low dose temazepam" to treat insomnia. A critical limitation of every claim is that the temazepam particles must have a specific surface area ("SSA")—a particle's total surface area divided by its weight—of 0.65 to 1.1 square meters per gram ("$m^2/g$"). Thus, to avoid any possible issue of infringement, Mutual filed an Abbreviated New Drug Application ("ANDA") that defined its product as having an SSA of *twice* the upper limitation—not less than "2.2 $m^2/g$." A5951 at A5959.

Under settled law, Mutual's ANDA specification precluded *any* possibility of infringement, because Mutual "could not, under its ANDA, lawfully produce a drug that does not meet its ANDA specification." *Bayer AG v. Elan Pharm. Res. Corp.*, 212 F.3d 1241, 1248 (Fed. Cir. 2000). As this Court had twice ruled well before Tyco sued: "[A]n ANDA specification defining a proposed generic drug in a manner that directly addresses … infringement will control," and "summary judgment of no literal infringement [is] properly granted where the ANDA specification require[s] the proposed drug to have a specific surface area outside the [claimed] range." *Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002) (citing *Elan*, 212 F.3d at 1249-50). That issue is "'straightforward.'" *Elan*, 212 F.3d at 1250.

Before Tyco sued, Mutual specifically advised Tyco that *Elan* foreclosed any finding of infringement. Tyco sued anyway. It invoked 35 U.S.C. §271(e)(2),

2

*Confidential Information Redacted*

which effectively gave Tyco a bondless, untested injunction against competition from Mutual, because filing a §271(e)(2) claim automatically stays FDA's approval of Mutual's generic product for 30 months. But after *Elan* and *Torpharm*, Tyco had no realistic chance of success under §271(e)(2)—and Tyco knew it. Tyco had Mutual's ANDA, which specifically defined Mutual's product as having an SSA of at least double that claimed by Tyco's patents. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████.

Mutual did just that. Not surprisingly, then, the district court granted judgment of noninfringement under §271(e)(2), citing "the salience of *Elan*" and noting that Tyco "did not offer evidence to rebut" Mutual's "evidence that the ANDA specification … directly addresses … infringement." A2117 at A2126-29.

As the district court observed, "Tyco's main argument" to avoid that ruling "[was] that 'Mutual's to-be-launched product, when tested properly, does not meet ANDA spec[ifications] for specific surface area.'" A2127 (alteration in original). But as the court recognized, that argument was legally irrelevant under *Elan*. Tyco made the argument simply to extend the litigation, as its patents do not require any particular testing method (A2123) and experts "on both sides" confirmed that

3

"[t]he surface area of a particular particle in the product has an objective measurement" that "can in fact be determined." A2164. Thus, Tyco only "disput[ed] the reliability of [Mutual's] *measurement* methodologies" (*id.* (emphasis added)), which might be relevant to a *§271(a) claim* involving a *future* commercial product —if that product were released in violation of Mutual's ANDA's restriction of "[not less than] 2.2 m$^2$/g." But as the district court recognized, *Elan* confirms that the only issue for a *§271(e)(2) claim* is whether the *ANDA* "directly addresses" the infringement question. 212 F.3d at 1249. Here, as in *Elan*, it did. It specifically barred release of any product falling within the claimed range of 0.65 to 1.1 m$^2$/g.

Making matters worse, Tyco further thwarted competition by filing an objectively baseless citizen petition with FDA, which together with its baseless lawsuit blocked Mutual's product *for over 15 months*. Tyco's petition sought to erect extraordinary barriers to final approval of Mutual's ANDA—requirements that FDA rejected out of hand as contrary to "more than two decades" of accepted FDA practice and as applicable only in "very rare instances" having nothing to do with Mutual's drug. A6049 at A6053-55. As FDA recognized, Tyco's petition—filed just days before the 30-month stay would have expired—was based "entirely on uncorroborated generalities and theoretical speculation," and on "no evidence." A6055.

Tyco's lack of good faith in filing suit was doubly confirmed by the decisions of both the district court and this Court invalidating Tyco's patents as obvi-

4

ous.  These decisions were based on specific, irrefutable evidence that Tyco possessed long before it sued.  As this Court explained, "the lower [6 to 8 mg] dosage of temazepam" was the "only" claim "limitation … not fully disclosed by the prior art Restoril®" (a commercial formulation sold years before the patent application).  642 F.3d at 1372.  And the claimed lower doses were supplied by other prior art, including two articles that taught "5-15 mg" doses for "elderly patients" and commercially-produced "5 mg temazepam hard capsules"—which "had been sold abroad for more than a decade" before the priority date.  *Id*. at 1374.

In short, "use of a 7.5 mg dose of temazepam … was not merely an obvious solution"; "it was a *known* solution" (A3818) (emphasis added), and Tyco's position that the prior art "reference to '5-15 mg' did not disclose all dosages between 5 and 15 mg" was downright "silly."  642 F.3d at 1373 n.3.  In fact, the inventors obtained the patents only by withholding the foregoing facts from the PTO.

Despite all this, the district court granted Tyco summary judgment on Mutual's antitrust counterclaims, ruling that no reasonable factfinder could find Tyco's suit "objectively baseless."  The court largely reasoned that, if Tyco's suit was so weak, Mutual should have sought summary judgment based on *Elan*.  But this was an outright mistake.  Mutual had consistently argued—at least six separate times—that *Elan* controlled.  Moreover, the court itself applied *Elan* in granting Mutual partial judgment under §271(e)(2), noting that Tyco was "silent" in response; and

5

██████████████████████████████████████████████

████████████████████████████████████ A2121, ████. At the very

least, there was a genuine dispute over whether, under *Elan*—where the ANDA re-

quired an SSA outside of the claimed range—any "reasonable litigant" in Tyco's

position "could realistically expect to secure favorable relief." *PRE*, 508 U.S. at

62. The record thus precluded summary judgment.

The district court also granted Tyco summary judgment on Mutual's *Walker*

*Process* fraud counterclaim. Yet Mutual presented evidence that, when Tyco sued,

it knew ██████████████████████████████████████████

██████████████████████████████████████████████

████████████ that the claimed SSA and particle size were disclosed in the prior art.

Further, the inventors knew full well that temazepam doses of 5-15mg were sold

overseas to treat insomnia long before they filed their patent application, yet they

hid this from the PTO and claimed that they had discovered a "totally unexpected

use" for 7.5mg temazepam. A6754 at A6758. Mutual's evidence showed that Ty-

co knew all this. But despite the fact that Mutual merely needed to show a genuine

factual issue, the district court held that no reasonable factfinder could conclude

that Tyco knew its patents were obtained by willfully defrauding the PTO.

The decision below should be reversed.

*Confidential Information Redacted*

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in granting summary judgment to Tyco on Mutual's sham litigation counterclaim on the basis that no reasonable fact-finder could find Tyco's §271(e)(2) claim "objectively baseless," where Mutual's ANDA specifically defined its product as having an SSA of *twice* the upper limitation—not less than 2.2 m$^2$/g—claimed in Tyco's patents;

II.    Whether the district court erred in granting summary judgment to Tyco on Mutual's sham litigation counterclaim based on a citizen petition, which Tyco filed with FDA on the eve of expiration of the automatic 30-month stay, seeking to impose extraordinary requirements that FDA rejected as contrary to "more than two decades" of accepted FDA practice and applicable only in "very rare instances" having nothing to do with Mutual's product; and

III.    Whether the district court erred in granting summary judgment to Tyco on Mutual's *Walker Process* fraud counterclaim on the basis that no reasonable factfinder could find that Tyco knew that its patents were obtained through knowing and willful fraud on the PTO, where Tyco knew that the inventors withheld that 5-15mg temazepam doses were used to treat insomnia long before prosecution and █████████████████████ that the claimed dosage form had the same SSA and particle size as the prior art.

7

## STATEMENT OF FACTS AND OF THE CASE

### A.    Temazepam

Temazepam is a sleep-inducing or "hypnotic" drug.  Since the 1970s, it has been sold internationally under the brand-name Levanxol® in, among other doses, 5 and 10mg hard gelatin capsules.  According to the 1983 British National Formulary ("BNF"), a British medical reference book, doses between 5 and 15mg are used to treat insomnia in the elderly, who need less temazepam and are more likely to experience adverse effects from higher doses.  *Tyco*, 642 F.3d at 1371.

Until 1991, the smallest commercially available dose of temazepam in the United States was 15mg, which Sandoz began selling in 1981 under the brand-name Restoril®.  A6362.  But even before 1991, some U.S. doctors—in keeping with the practice of prescribing the lowest effective dose—prescribed half of a 15mg Restoril capsule to treat insomnia.  *Id.*  As these doctors recognized, some patients reacted adversely to 15mg and a lower dose could be equally effective.  *Id.*

### B.    Tyco's patents and the "specific surface area" limitation

In 1986, Sandoz filed a patent application directed to "low dose temazepam" that resulted in the Tyco patents—U.S. Patent Nos. 5,030,632, 5,211,954, 5,326,758, and 5,629,310.  A3982-96.  All four patents claim pharmaceutical compositions containing between 6 and 8mg of crystalline temazepam with an SSA of 0.65 to 1.1 square meters per gram ("$m^2/g$") and a particle size of less than 65 mi-

8

crons, and the use of those compositions to treat insomnia.  *Id*.  The claims do not require any particular method of measuring SSA.  *Id*.

SSA is "the total surface area of the particle divided by the particle's weight."  *Elan*, 212 F.3d at 1245 n.3.  SSA and particle size are inversely related: smaller particles yield more surface area on a per-gram basis.  A6254-55.  As experts on "both sides" opined, "[t]he surface area of a particular particle in the product has an objective measurement" and "can in fact be determined."  A2158 at A2164.

During prosecution, the examiner rejected Tyco's patents' claims as obvious over prior art references disclosing "the advantage of fine particle size for rapid bioavailability of temazepam, which can be filled into capsules."  A6750-51.  Sandoz overcame this rejection by knowingly withholding at least two material prior art references.  A6480-85.

Sandoz argued that the claimed particle size limitations distinguished the invention from the prior art.  But Sandoz knowingly concealed from the examiner that—long before the priority date—it had been selling 15mg Restoril capsules containing temazepam with the exact same particle size and SSA specifications.  A6480-83.  The only difference was that the prior art Restoril capsule had a higher dose (15mg) than the claimed 6-8mg range.  *Tyco*, 642 F.3d at 1372.

*Confidential Information Redacted*

To hide this information from the PTO, Sandoz engaged in selective disclo-

sure.  In support of its claim of "non-obviousness" regarding the low-dose element

of the claimed invention, Sandoz submitted what it called the "pertinent sections of

the FDA's approvable letter of December 28, 1989" for its 7.5mg capsules.  A5864

at A5867.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

Sandoz also argued that nothing in the prior art taught doses below 10mg

and that it had "found a totally unexpected use [*i.e.*, treating insomnia] for a 7.5

milligram capsule."  A6754 at A6758.  But Sandoz concealed that 5-15mg doses

had been used to treat insomnia in the elderly for years.  Sandoz knew this from

earlier written communications with FDA concerning Sandoz's supplemental NDA

for 7.5mg temazepam.  In a 1984 "Memo for the Record," Sandoz memorialized

those communications and acknowledged that, "'in Great Britain, temazepam dos-

es from 5-15mg are recommended for geriatrics.'"  A5826 at A5828; *Tyco*, 642

F.3d at 1372 n.2.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

*Confidential Information Redacted*

Tyco was aware of Sandoz's efforts to conceal this information from the PTO.  In 2001, Sandoz sold the patents to Tyco.  A5876. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

        ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

### C.    Mutual's ANDA and notice letter

████████████████  Mutual filed an ANDA seeking to market a generic 7.5mg temazepam capsule.  A5951.  The ANDA contained a "Paragraph IV certification" asserting that the three Tyco patents then listed in FDA's Orange Book were invalid, unenforceable, and not infringed by Mutual's product.  A5955-57; 21 U.S.C. §355(j)(2)(A)(vii)(IV).  The ANDA specified that Mutual's temazepam product

11

would have an SSA of "[not less than] 2.2 m$^2$/g" (A5959)—twice the maximum SSA claimed by Tyco's patents.

In a pre-lawsuit notice letter to Tyco (A5971-88), Mutual specifically highlighted the *Elan* decision, noting that "[w]hen the ANDA specification defines the product in a way that directly addresses the question of infringement, it controls the [infringement] inquiry." A5980 (citing *Elan*). Mutual then explained that "[t]he limitation 'crystalline temazepam having a surface area of from 0.65 to 1.1 m$^2$/g is common to all of the independent claims in the Tyco patents." *Id*. Further, because "Mutual's ANDA requires the surface area of the temazepam in the Mutual Product to be not less than 2.2 m$^2$/g," "Mutual cannot use temazepam having a surface area of less than 2.2m$^2$/g," and "thus the Mutual Product cannot literally infringe." A5981.

Mutual also addressed the doctrine of equivalents. "The limitation 'surface area of 0.65 to 1.1 m$^2$/g' is a 'clear structural limitation,'" the letter explained, and "[f]inding that temazepam with a surface area greater than 2.2 m$^2$/g is equivalent to temazepam with a surface area of 0.65 to 1.1 m$^2$/g would eviscerate the plain meaning of that limitation." A5981.

Mutual enclosed an excerpt of the ANDA's specification, which legally mandated that its product's SSA could not be less than 2.2 m$^2$/g. A5988. Mutual even offered Tyco "confidential product samples and access to the ANDA," so Ty-

12

co could "assess [its] claims." A5983. Before filing suit, Tyco accepted this offer, obtaining access to Mutual's ANDA. A6004-06. Tyco also initially requested product samples—a request Mutual granted (A6000)—but Tyco declined to receive them.

### D.    Infringement and validity proceedings in the district court

### 1.    Tyco files suit

In March 2007, Tyco sued Mutual for patent infringement. A66. For each patent, Tyco alleged that Mutual's ANDA filing was an act of infringement under 35 U.S.C. §271(e)(2)(A). A69-78. By filing suit within 45 days of Mutual's notice letter, Tyco triggered Hatch-Waxman's automatic stay of FDA approval of Mutual's ANDA for 30 months or until the infringement action is resolved. *Id.*; 21 U.S.C. §355(j)(5)(B)(iii); 35 U.S.C. §271(e)(4); *see Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1282-84, 1287 & n.7 (Fed. Cir. 2008) (describing Hatch-Waxman framework). Tyco also alleged that Mutual's product, if ultimately sold, would directly infringe the patents under §271(a), and that Mutual would induce and contribute to infringement under §§ 271(b) and (c). A69-78.

Mutual later filed antitrust counterclaims asserting that "[d]espite the conclusive and irrefutable proof provided to Plaintiffs that the product covered by Mutual's ANDA does not and cannot infringe [their] patents, Plaintiffs filed this ob

*Confidential Information Redacted*

jectively baseless lawsuit … for the purpose of invoking the automatic 30-month

stay of FDA's ability to approve Mutual's ANDA."  A118 at A140, A132-46.

### 2.    FDA's tentative approval of Mutual's ANDA

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████.

### 3.    Mutual's initial motion for summary judgment

In July 2008, after fact discovery closed, Mutual sought summary judgment.

Consistent with its notice letter, Mutual's leading point was that Tyco could not

establish infringement under *Elan*:

> Mutual's ANDA requires that its temazepam particles in the generic
> product have a surface area of at least 2.2 square meters per gram
> ("$m^2/g$"), while each claim in the '954 patent requires temazepam par-
> ticles having a surface area of from 0.65 to 1.1 $m^2/g$.  Mutual's ANDA
> therefore defines the generic temazepam product in a way that cannot
> infringe the '954 patent.  *See Bayer AG v. Elan Pharma. Research
> Corp.,* 212 F.3d 1241, 1249 (Fed. Cir. 2000) (upholding summary
> judgment of non-infringement because the ANDA defined the product
> "in a way that directly addresses the question of infringement.").

A351 at A354; *accord* A356-58.[1]  Mutual also noted that "Tyco ha[d] never pur-

sued a doctrine of equivalents theory" and that any such argument would be "fu-

---

[1] Because the other patents expired in July 2008, Mutual's motion addressed only
the '954 patent.

14

tile" given the "significant differences between the temazepam surface area of at least 2.2 m$^2$/g in the accused ANDA product and the claimed 'surface area of from 0.65 to 1.1 m$^2$/g.'" A359-61.

Tyco's only response was that Mutual's motion was premature. A364. The court agreed, stating that summary judgment motions needed to await the close of expert discovery. A366.

### 4.    Mutual's request for leave to seek summary judgment

Mutual thus waited until March 2009 to seek leave to move for summary judgment. Tyco objected ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████         ████████████████. Mutual responded by pointing to *Elan*'s holding that "'factual issues as to whether [the generic manufacturer] can comply with its specification … are not material factual issues because 21 U.S.C. § 331(d) prohibits … selling any product that does not meet the ANDA's require-ments." A392 at A399 (quoting *Elan*, 212 F.3d at 1250); *accord* A483-84.

In September 2009, the court granted Mutual leave to seek summary judg-ment (A2157), and as discussed below ultimately ruled in Mutual's favor.

### 5.    Tyco's effort to extend the stay

Meanwhile, faced with expiration of the 30-month stay, Tyco sought to ex-tend it ████████████████████████████████████████████████████████████

██████████████████████████████████ Mutual countered that such testing was irrelevant under *Elan*, and that Tyco was improperly "pursuing a regular patent case under Section 271(a)" in "the guise of a Hatch-Waxman case under Section 271(e)(2)." A9701 at A9706. As Mutual explained, only the latter may "give rise to the 30-month stay, and to the statutory authority for courts to … lengthen the stay." A9710. Mutual continued: "Tyco's claim flies squarely in the face of the Federal Circuit's authoritative holding in *Elan*." A9711-12.

The district court denied Tyco's motion, holding that "the evidence and the legal position strongly support the situation described by the Federal Circuit in *Bayer AG v. Elan*." A2133 at A2151. Under *Elan*, Tyco's supposed need to test Mutual's ANDA product to determine "whether or not it meets the ANDA specifications" was not "a sufficient basis for extending the stay." *Id.* If Mutual "market[ed] a product which does not conform to its ANDA," it would face "various and sundry penalties" described in *Elan* and an "infringement suit" under §271(a). A2154.

> **6.** **The expiration of the 30-month automatic stay, Tyco's unsuccessful request for a preliminary injunction, and the court's dismissal of Tyco's §271(e)(2) claim**

Tyco then sought a preliminary injunction. Mutual resisted, again invoking *Elan* and arguing that "Mutual's ANDA defines a noninfringing product because it requires a surface area greater than 2.2 $m^2/g$, whereas Tyco's patent requires a sur

face area less than 1.1 m$^2$/g." A1409 at A1414. Mutual also moved for judgment of noninfringement on partial findings under Federal Rule of Civil Procedure 52(c). A2128.

The court asked Tyco's counsel whether, if it "decide[d] this case based upon *Elan*," the record was "full and complete," and Tyco's counsel agreed. A2218-19. The court continued: "And I gather, by the way, that that is to a certain degree parallel to the motions for summary judgment that the defendants have been trying to pursue … based upon the *Elan* analysis." A2219. Tyco's counsel agreed. *Id.*

The court denied injunctive relief and granted Mutual's motion for a judgment on noninfringement based on its ANDA filing. It stated that "the threshold question [under *Elan*] is whether the ANDA specification … defines the compound in a manner that directly addresses the issue of infringement." A2121. Noting "that the ANDA specifies that the SSA of its temazepam is at least 2.2 square meters per gram," the court explained that "Tyco does not dispute this in its briefs, which are silent on the question," or "present any evidence … to negate the conclusion … . Rather, Dr. Luk, Tyco's expert, admitted that it was possible to manufacture temazepam with a SSA that conformed to the ANDA." A2121-22.

Thus, upon finding that "the patent covers temazepam with a SSA below 1.1 square meters per gram," the district court held "[p]ursuant to *Elan*" that "the ANDA requires that Mutual market a temazepam product with a SSA that does not

infringe." *Id*. As this Court later observed, the district court ruled "based on *un-controverted evidence* that Mutual's ANDA disclosed a product that could not literally infringe." *Tyco*, 642 F.3d at 1371 (emphasis added) (citing *Elan*).

The district court also addressed a dispute between the parties about *how* to measure SSA. Specifically, the parties disagreed on "the temperature at which outgassing should be conducted" before taking the measurement. A2124. ("Outgassing" removes gases or vapors present on the particles' surface. A6258.) The court deemed the dispute legally irrelevant, explaining to Tyco's counsel: "Experts may disagree about how to test it, but your patent specifies a particular range of surface area. [Mutual's] ANDA specifies a surface area that is beyond the range claimed in your patent." A2168. In other words, "Tyco's main argument"—"that 'Mutual's to-be-launched product, when tested properly, does not meet ANDA spec[ifications] for specific surface area'"—"overlook[s] the key inquiry that *Elan* requires" and, even if correct, "would still fail to show [infringement]." A2127.

The court thus granted Mutual's motion for judgment of noninfringement under Rule 52(c). A2128-29. "[T]his Court asked Tyco whether there was anything it had not presented in regard to the question of infringement under *Elan*," the court explained, "and Tyco answered in the negative. … Tyco has been fully heard." A2128. Based on *Elan*, therefore, the court granted Mutual judgment on Tyco's §271(e)(2)(A) claim. *Id.*

18

### 7.    Tyco's citizen petition and FDA's denial thereof

The very next day, unable to keep Mutual off the market any longer through litigation, Tyco filed a citizen petition with FDA seeking to impose extraordinary requirements on Mutual's final approval.  A6036-47.  Tyco's petition requested that FDA withdraw its existing guidelines for approving generic temazepam products and instead require generics such as Mutual to provide additional data for five, non-standard pharmacokinetic parameters.  A6037-38.  Alternatively, Tyco asked FDA to designate temazepam as a drug for which generic versions cannot be approved.  As FDA observed, Tyco's only argument was that the "significantly greater specific surface area" of Mutual's product posed "a greater safety risk compared to Restoril."  A6049-50.

FDA denied Tyco's petition in its entirety.  As FDA noted, Tyco "provided *no evidence* from clinical trials, pharmacokinetic studies, bioequivalence testing, or any other source" and instead "*relie[d] entirely on uncorroborated generalities and theoretical speculation*."  A6055 (emphasis added).  Moreover, the petition's "only allegedly new information"—the "two-fold difference" in SSA—had been "carefully examined" and Tyco failed "to demonstrate that this difference is in fact relevant" to bioequivalence—the only requirement for generic approval.  A6056.  As for the supposed safety issues, FDA explained that these have been "well known" since "long before" it issued guidelines for approving generic temazepam.  A6055.

19

Similarly, the requirements for generic approval that Tyco challenged "have been applied by FDA for more than two decades," while the additional requirements Tyco sought to impose could only conceivably apply in "very rare instances" that would not apply to *any* temazepam product.  A6053-55.

Solely because of Tyco's petition, however, FDA did not approve Mutual's ANDA until September 8, 2009—27 days after the 30-month stay expired. A6059-63.

### 8.    FDA's approval of Mutual's ANDA and Mutual's market entry

Mutual began marketing generic temazepam on the same date, quickly gaining market share.  A3883, A3887, A922.  Before September 2009, Tyco was the only seller of 7.5mg temazepam capsules in the United States with sales averaging over $30 million.  A3883, A4294; *Tyco*, 642 F.3d at 1377.

### 9.    Mutual's successful motion for summary judgment

In December 2009, having obtained a judgment of noninfringement by Mutual's *ANDA filing* under §271(e)(2), Mutual sought summary judgment of noninfringement by its *commercial* product under §271(a).  For its commercial product, Mutual argued that its method of measuring SSA was accurate, while Tyco's method improperly altered Mutual's product to obtain infringing samples.  A2456-67.  That issue, however, was irrelevant to Tyco's (by now dismissed) §271(e)(2) claim, which had triggered the 30-month stay.  As Mutual emphasized, "Mutual's

ANDA … specifies that the SSA of Mutual's 7.5 mg temazepam product must be 'not less than 2.2 m2/g.' The Court has already ruled that a product that complies with Mutual's ANDA does not infringe." A2460 (internal citation omitted).

The district court did not need to reach this issue, as it granted Mutual's motion for summary judgment on obviousness in May 2010. A3083. Citing "Mutual's strong showing of obviousness" and finding it "clear that [Tyco's] arguments are incorrect," the court explained that "use of a 7.5 mg dose of temazepam … was not merely an obvious solution at the time of invention; it was a known solution." A3816-18. The court also found "somewhat incomprehensible … [Tyco's expert's] opin[ion] that a recognized publication … which clearly states that doses in the range of 5mg to 15 mg may be used to treat insomnia in the elderly, does not teach the use of doses in that range for the treatment of insomnia." A3809.

### E.    This Court's affirmance of summary judgment for Mutual

In June 2011, this Court unanimously affirmed the patent's invalidity. As the Court explained, "the only limitation of the two '954 claims that was not fully disclosed by the prior art Restoril® is the lower dosage." *Tyco*, 642 F.3d at 1372. Then, citing the BNF reference—which taught both that one should "reduce dosage in elderly and debilitated patients" and recommended a specific "[d]ose" of "5-15 mg"—the court affirmed that "[t]he recommendation in the BNF of a range of

temazepam dosages that include the dosages claimed in the '954 patent renders obvious the claims to those dosages." *Id*. at 1373-74.

The Court emphasized that "Tyco does not dispute that … 5 mg temazepam hard capsules had [then] been sold abroad for more than a decade" and that "two prior art publications discuss[] experimentation with 5 mg capsules." *Id*. As to Tyco's expert's argument "that the reference to '5-15 mg' did not disclose all dosages between 5 and 15 mg," that position was downright "silly." *Id.* at 1373 n.3.

The Court then concluded that "none of the relevant references … could be viewed as teaching away from the use of 7.5 mg temazepam capsules generally." *Id*. at 1376. But "even if [they] could," the Court continued, "it would not cast doubt on the BNF reference's dosage range for elderly patients" because "none of [them] … studied the effects of temazepam on elderly patients." *Id*. "If anything," prior studies "point toward the use of lower-dosage capsules." *Id*.

Finally, the Court addressed "secondary considerations" of non-obviousness, concluding that Tyco's arguments were "unsupported," "of little relevance," and "entitled to little weight." *Id*. at 1377.

## F.    Antitrust and inequitable conduct proceedings below

On remand, the district court granted Tyco summary judgment on Mutual's antitrust counterclaims, while denying Tyco summary judgment on inequitable

conduct.[2]  A3 at A16-17.  The court ruled that Mutual could not invoke the "sham litigation" or "*Walker Process* fraud" exceptions to *Noerr-Pennington* immunity, which generally "shield[s] [parties] from antitrust liability under the Sherman Act when petitioning the government for the enforcement of laws."  A6.

### 1.    The district court's "sham litigation" ruling

Mutual's "sham litigation" counterclaim essentially maintains that Tyco's suit was an objectively baseless attempt to block competition because it was clear that *Elan* foreclosed a finding of infringement under §271(e)(2) and that using 7.5mg doses of temazepam was obvious and known at the time of invention.  Mutual also asserts that Tyco's citizen petition was a sham.

As to whether *Elan* plainly controlled, the court found it "curious that, if this was so obvious, Defendants never moved for summary judgment … on that theory."  A7.  But this statement was factually incorrect.  The court apparently had in mind Mutual's motion for summary judgment on its *commercial product* under *§271(a)*, where *Elan* was not relevant.  Under *§271(e)(2)*, however, the court had already entered judgment of noninfringement in August 2009, based on Mutual's *ANDA filing* and Mutual's argument that *Elan* controlled.  Perhaps based on that

---

[2]  Mutual's counterclaims included two Sherman Act claims, attempted monopolization (Count 6); monopolization (Count 7); common law unfair competition (Count 8); New Jersey attempted monopolization (Count 9) and monopolization claims (Count 10); and inequitable conduct (Count 5).  A3-4.

confusion, the court stated "*Elan*'s controlling significance" was "clear" only in "the rear view mirror." A7.

Without acknowledging its earlier Rule 52(c) judgment, the district court cited a passage from its preliminary injunction ruling that addressed a dispute over "the method to be used for the measurement of the particle surface area of temazepam." Reasoning that this issue was not "straightforward," the court concluded that Tyco "could have reasonably believed that *Elan* might not" control. A8-9, 10. The court did not discuss its earlier holding that Tyco's focus on testing methods "overlook[s] the key inquiry that *Elan* requires." A2127.

On obviousness, the district court reasoned that Tyco "merely acquired the patents" and could have expected to prevail "given the presumption of validity" and "clear and convincing evidence" standard. A12, A11. The court nowhere addressed its earlier conclusions that Mutual made a "strong showing of obviousness," that it was "clear that [Tyco's] arguments [were] incorrect," or that "use of a 7.5 mg dose of temazepam … was not merely … obvious," but "known." A3816, A3818.

As to Tyco's citizen petition, the district court found the Supreme Court's decision in *PRE* to be "inapposite because it is expressly limited to litigation." A12. Then, without analyzing Tyco's petition or FDA's rejection thereof, the court concluded that "Defendants have not shown that, applying the law to the

24

facts, they could prevail at trial on … whether the Citizen Petition was a sham."
A13.

### 2.    The district court's "*Walker Process* fraud" ruling

The district court also granted Tyco summary judgment on Mutual's *Walker Process* fraud counterclaim, which maintains that Tyco's patents were obtained by willfully defrauding the PTO.  Specifically, Mutual presented evidence that Sandoz concealed that the only novel aspect of the claimed invention was its lower dosage, and that the lower dosage was already known and used to treat insomnia in England.  Mutual also presented evidence that, when Tyco sued, it knew of Sandoz's fraud—including evidence that Tyco had access to files evidencing the fraud (including the Memo for the Record and the unredacted Approvable Letter), had carefully reviewed those files on several occasions, was aware of the content of those files, and had been put on notice that the PTO had allowed the claims based on a mistaken belief that the claimed dosage and the SSA and particle size were novel. *Supra* at 9-11.

The district court ignored much of this evidence, focusing only on the fact that Tyco had reviewed the patent prosecution file and was aware of the Memo for the Record.  A14.  The court concluded that this review alone could not have revealed the fraud because "surely the PTO would have noticed and refused to grant the patents."  *Id*.  While recognizing that a jury could infer from Tyco's knowledge

25

of the Memo for the Record that Tyco knew "the patents might be vulnerable to a validity challenge," the district court concluded that the evidence could not establish that Tyco was aware of fraud on the PTO.  A15.

### G.    Entry of Consent Order of Final Judgment

The parties thereafter agreed to dismiss Mutual's inequitable conduct counterclaim with prejudice and requested entry of final judgment, which was entered on April 30, 2013.  A1.  Mutual timely appealed.

## SUMMARY OF ARGUMENT

I.  The district court erred in finding no genuine factual dispute as to whether Tyco's §271(e)(2) claim was "objectively baseless."  *PRE*, 508 U.S. at 62.  Whether a party has "probable cause" to sue "is often not appropriate for summary disposition."  *Personnel Dept., Inc. v. Prof'l Staff Leasing*, 297 F. App'x 773, 781 (10th Cir. 2008) (citation omitted).  That is the case here.

I.A.  *Infringement*.  At a bare minimum, there is a triable issue as to whether Tyco reasonably could have expected to establish infringement.  Mutual's ANDA defined its product as having an SSA of not less than 2.2 $m^2$/g—*twice* the maximum SSA claimed by Tyco.  And as Mutual informed Tyco before Tyco sued, "an ANDA specification defining a proposed generic drug in a manner that directly addresses … infringement will control," and "summary judgment of no literal infringement [is] properly granted where the ANDA specification require[s] the pro

26

*Confidential Information Redacted*

posed drug to have a specific surface area outside the [claimed] range." *Torpharm*, 300 F.3d at 1373 (citing *Elan*, 212 F.3d at 1249-50). *Elan* deemed this question "'straightforward.'" 212 F.3d at 1249, 1250. Thus, a reasonable factfinder could find Tyco's §271(e)(2) claim baseless based on *Elan* alone.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████. Nonetheless, Tyco sued—obtaining an automatic stay of FDA approval and blocking competition for over 15 months.

Still, the district court found no triable issue as to whether Tyco's claim was a "sham," finding it "curious" that Mutual "never moved for summary judgment" based on *Elan* if it "so obvious[ly]" controlled. A7. But this was demonstrably in-correct. Mutual repeatedly invoked *Elan*. And the court itself had *already entered judgment* under §271(e)(2), noting that "Tyco did not offer evidence to rebut" *Elan*'s "core holding." A2126-27. Reversal is warranted.

I.B. *Validity*. As to validity, too, there is at least a triable issue whether Ty-co reasonably could have expected to prevail. Both this Court and the district court held Tyco's patents obvious, noting that "the only limitation … not fully disclosed

by the prior art Restoril® is the lower dosage," and that other prior art taught doses of "5-15 mg" for "elderly patients." *Tyco*, 642 F.3d at 1372, 1374.  Indeed, long before prosecution, "5 mg temazepam hard capsules had been sold abroad for more than a decade." *Id*.  Thus, "use of a 7.5 mg dose of temazepam … was a *known* solution." A3803 at A3818 (emphasis added).  Further, Mutual presented evidence that Tyco knew this when it sued Mutual.

The court below ignored these earlier holdings, reasoning that Tyco could have expected success based on the "presumption of validity" and "clear and convincing evidence" standard.  A11.  But if those *procedural* devices could establish a claim's objective basis, then patent claims could never be a "sham."  Further, as this Court earlier explained: "Ordinarily, 'where there is a range disclosed in the prior art, and the claimed invention falls within that range, *there is a presumption of obviousness.*'" *Tyco*, 642 F.3d at 1372 (citation omitted).  Thus, a reasonable factfinder could conclude that Tyco's validity position was objectively baseless.

II.  The district court also erred in granting Tyco summary judgment on Mutual's sham challenge to its citizen petition—filed days before the automatic stay of FDA approval expired—seeking to impose extraordinary requirements on Mutual's final approval that FDA summarily rejected as contrary to "more than two decades" of accepted FDA practice.  A6049 at A6053.  The court wrongly believed that "*PRE* is inapposite because it is expressly limited to litigation" (A12 & n.1)

28

*Confidential Information Redacted*

and it never analyzed Tyco's petition. But *PRE* is not limited to litigation in federal court and, indeed, applies directly here—where FDA held that Tyco's petition "provided no evidence from clinical trials, pharmacokinetic studies, bioequivalence testing, or any other source" and instead "relie[d] entirely on uncorroborated generalities and theoretical speculation." A6055. A reasonable factfinder could find the petition objectively baseless.

III. The district court likewise erred in granting summary judgment to Tyco on Mutual's *Walker Process* fraud counterclaim. It is undisputed that when Tyco filed suit, it possessed *all* the information relied upon by both this Court and the district court in invalidating the '954 patent. But despite the evidence that both Sandoz and Tyco knew that temazepam doses of 5-15mg had long been sold overseas and that ███████████████████████████████ the claimed SSA and particle size were known in the prior art, the court held that no reasonable factfinder could conclude that Tyco's patents were obtained by willfully defrauding the PTO. Such "issues of knowledge and intent are particularly inappropriate for resolution by summary judgment." *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985). This case is no exception.

The decision below should be reversed.

29

## STANDARD OF REVIEW

Summary judgment determinations are reviewed de novo. *Frolow v. Wilson Sporting Goods Co*., 710 F.3d 1303, 1308 (Fed. Cir. 2013) (citing *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc)).   Summary judgment is appropriate here only if, after "credit[ing] all of [nonmovant Mutual's] evidence and draw[ing] all justifiable inferences in [Mutual's] favor," "'there is no genuine dispute as to any material fact.'" *Id*. (quoting Fed. R. Civ. P. 56(a)).   "Knowledge and belief are characteristically questions for the factfinder" (*Cheek v. United States*, 498 U.S. 192, 203 (1991)), as are disputed "facts tending to 'prove or disprove the existence of probable cause.'"  *In re Relafen Antitrust Litig*., 346 F. Supp. 2d 349, 360-61 (D. Mass. 2004) (quoting *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878)).

## ARGUMENT

## I.    The district court erred in granting summary judgment to Tyco on Mutual's "sham litigation" claim.

The district court erred in granting summary judgment to Tyco on Mutual's sham litigation claim.   Such claims are an exception to the First Amendment principle that "[t]hose who petition government for redress are generally immune from antitrust liability." *PRE*, 508 U.S. at 56.   Whether a lawsuit (or citizen petition) is a "sham" turns on two inquiries.

*First*, the lawsuit must be "objectively baseless" in the sense that "no reasonable litigant could realistically expect to secure favorable relief." *Id*. at 62.   "If

30

an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized." *Id.* at 60; *see id.* at 62 (plaintiffs must have "probable cause" to file suit, which requires a reasonable belief in their chances of success). *Second*, if the challenged litigation (or petition) is "objectively meritless," the court asks "whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor' through the use of the governmental process … as an anticompetitive weapon." *Id.* at 60-61 (quoting *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).

Here, Tyco obtained summary judgment based solely on *PRE*'s first prong. But whether Tyco "could realistically expect to secure favorable relief" on its §271(e)(2) claim or its citizen petition is clearly disputed. *PRE*, 508 U.S. at 60. The district court could conclude otherwise only by outright ignoring both critical evidence and its own earlier decisions.

### A. Under *Elan*, a reasonable factfinder could conclude that Tyco's §271(e)(2) infringement claim was a sham.

Had Tyco not invoked 35 U.S.C. §271(e)(2), Mutual would have been free upon FDA approval of its ANDA to sell generic temazepam while litigating infringement under 35 U.S.C. §271(a). But §271(e)(2)(A) makes "submitting an ANDA" with a Paragraph IV certification a "highly artificial act of infringement."

31

*Eli Lilly & Co. v. Medtronic*, 496 U.S. 661, 678 (1990). Submitting such an ANDA has "artificial … consequences" (*id*.)—including an automatic 30-month stay of FDA approval, which ends prematurely only when the subject patents expire or a court rules them invalid or not infringed. 21 U.S.C. §355(j)(5)(B)(iii)(I)-(III).

Recognizing this, Tyco invoked §271(e)(2), ultimately delaying competition from Mutual for at least 15 months. As settled precedent confirms, there is a genuine dispute as to whether Tyco's §271(e)(2) claim was objectively baseless.

> **1.    *Elan* establishes at least a factual dispute as to whether Tyco's §271(e)(2) claim was objectively baseless.**

The key infringement case is *Elan*, a unanimous decision that this Court has twice reaffirmed. *Torpharm*, 300 F.3d at 1373; *In re Brimoninide Patent Litig.*, 643 F.3d 1366, 1377-78 (Fed. Cir. 2011). In *Elan*, Bayer alleged §271(e)(2) infringement based on a patent claiming nifedipine "crystals with a specific surface area [SSA] of *1.0 to 4 $m^2/g$*." 212 F.3d at 1246 (emphasis added). Elan's ANDA specification, however, sought to market only nifedipine with "crystals of a SSA of *5 $m^2/g$ or greater*." *Id*. (emphasis added). Elan thus filed a Paragraph IV certification, notifying Bayer "that the SSA of its nifedipine was outside any of [Bayer's] patent's claimed SSA ranges." *Id*.

32

The district court granted Elan summary judgment. "Elan's ANDA specifies that the proposed product will have a SSA greater than 5 m$^2$/g," the court explained, and "Bayer could sue Elan for infringement if Elan begins manufacturing … a product with [an infringing] SSA." *Id*. at 1246, 1248 (citation omitted). Bayer appealed.  It argued that evidence of "an infringing biobatch" and evidence concerning Elan's "test protocol" and "test equipment" suggested that Elan could not "comply with its SSA specification." *Id*. at 1248.  But this Court affirmed, holding that those issues were "not material" and finding "'the ultimate question of infringement … straightforward.'" *Id*. at 1250 (citation omitted).

As this Court explained, §271(e)(2) focuses on "'what the ANDA applicant will likely market if its application is approved'"—a question "'grounded in the ANDA application.'" *Id*. at 1249 (citation omitted).  When an ANDA "recites that the SSA of [the generic] drug will be … above [the claimed range]," it "describes a well-defined compound" and "directly addresses the question of infringement"— making it "straightforward." *Id*. at 1250 (citations and quotations omitted).  The generic "is bound by [the ANDA] specification," including "in manufacturing," and it violates the ANDA on pain of "civil penalties," "withdrawal of [FDA] approval," and "criminal prosecution." *Id*. at 1249-50.  Thus, "[a]lthough there may be factual issues as to whether [the generic] can comply with its specification, *they are not material factual issues because 21 U.S.C. §331(d) prohibits* [*the generic*]

33

*from selling any product that does not meet its ANDA's requirements.*"  *Id*. at 1250
(emphasis added).

Elan thus distinguished *Glaxo Inc. v. Novopharm Ltd.*, 110 F.3d 1562 (Fed.
Cir. 1997), "because the ANDA specification [there] did not define the compound
in a manner that directly addressed … infringement."  *Id*.  And as this Court une-
quivocally reaffirmed five years before Tyco filed suit:  "[A]n ANDA specification
defining a proposed generic drug in a manner that directly addresses the issue of
infringement will control the infringement inquiry," and "summary judgment of no
literal infringement [is] properly granted where the ANDA specification require[s]
the proposed drug to have a specific surface area outside the [claimed] range."
*Torpharm*, 300 F.3d at 1373 (citing *Elan*, 212 F.3d at 1249-50).

*Elan* and its progeny squarely control this case, and raise at least a factual
dispute as to whether Tyco "could realistically expect to secure favorable relief"
under §271(e)(2).  *PRE*, 508 U.S. at 62.  Here, as there, the ANDA specifies an
SSA well above the range claimed in the patents.  A5959.  Here, as there, the
ANDA "mandates a finding of no literal infringement" because "[a] product manu-
factured to [its] specifications could not literally infringe."  212 F.3d at 1249; 642
F.3d at 1371.  Here, as there, Mutual put Tyco on notice of Mutual's ANDA and
its product's SSA before Tyco sued.  A5971 at A5981, A5987.  And here, as there,

*Confidential Information Redacted*

Tyco questions "whether [Mutual] can comply with its specification." *Elan*, 212 F.3d at 1250.

Specifically, Tyco argues that Mutual's ANDA disclosed an improper method of measuring SSA. But that is beside the point. Tyco's patents did not require a particular method. A2123. And as the district court observed, "[e]xperts may disagree about how to test it, but [Tyco's] patent[s] specif[y] a particular range of surface area" and Mutual's "ANDA specifies a surface area that is beyond the range claimed." A2168. If Mutual's method were proven incorrect, Tyco could "run[] to the FDA" to enforce the "strict statutory provisions to sell only those products that comport with the [ANDA]." *Id.*; *Torpharm*, 300 F.3d at 1373. Tyco could also seek an injunction and damages under §271(a). But as *Elan* held long before Tyco sued, "whether [a generic drug maker] can comply with its specification" is "not material" under §271(e)(2), which turns solely on whether the product defined in the ANDA itself would be infringing.

In fact, Tyco's infringement claim is *weaker* than Bayer's. Mutual's ANDA specifies an SSA at least *100 percent* greater than Tyco's, compared with a *25 percent* disparity in *Elan*.[3] ██████████████████████████████████████

---

[3] Elan's SSA was 25% greater than Bayer's. *Id*. at 1246. Tyco claimed the SSA range of 0.65 to 1.1 $m^2/g$, whereas the SSA of Mutual's product is "not less than 2.2 $m^2/g$"—at least *100%* greater. A3982-96, A5959.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████. That is exactly what Mutual did—raising its

product's SSA to more than double the claimed range.  A5959.  ████████████

████████████████████████████.

Whether there is "probable cause" to sue "is often not appropriate for sum-

mary disposition." *Personnel Dept.*, 297 F. App'x at 781 (citation omitted).  On

this record, there is plainly a triable issue as to whether Tyco's infringement claim

was objectively baseless.

## 2. The district court's grounds for granting summary judg-ment in the face of *Elan* do not withstand scrutiny.

Although *Elan* and this case are essentially identical, the district court grant-

ed Tyco summary judgment on Mutual's sham litigation counterclaim.  The court

principally reasoned that, "if it was obvious that *Elan* was the relevant controlling

authority," then it is "curious that … Defendants never moved for summary judg-

ment on that theory."  A7.  But this statement rests on an *outright factual mistake*.

At every relevant stage—from Mutual's 2007 notice letter to its first summary

judgment motion, its opposition to extending the 30-month stay, its opposition to a

preliminary injunction, its request for leave to seek summary judgment, its motion for a Rule 52(c) judgment, and its second summary judgment motion—Mutual argued that the §271(e)(2) infringement analysis must begin and end with Mutual's ANDA and *Elan*.[4]

In fact, by the time Mutual filed its second summary judgment motion, the district court had *already* applied *Elan in granting Rule 52(c) judgment to Mutual on Tyco's §271(e)(2) claim.* A2117 at A2128-29.[5] As this Court later put it: "The district court [ruled] based on uncontroverted evidence that Mutual's ANDA disclosed a product that could not literally infringe the '954 patent because the ANDA required the surface areas of the crystalline temazepam to be at least 2.2 square

---

[4] *Supra* at 11-18, 21; A5971 at A5981 ("Mutual cannot use temazepam having a surface area of less than 2.2m²/g" and "thus … cannot literally infringe" (citing *Elan*)); A351 at A354 ("Mutual's ANDA … defines the generic temazepam product in a way that cannot infringe" (citing *Elan*)); A392 at A399 ("'factual issues as to whether [the generic manufacturer] can comply with its specification … are not material factual issues because 21 U.S.C. § 331(d) prohibits … selling any product that does not meet the ANDA's requirements'" (citing *Elan*)); A1409 at A1414 ("Mutual's ANDA defines a noninfringing product because it requires a surface area greater than 2.2 m²/g" (citing *Elan*)); A9701 at A9706, A9711-12 (Tyco is "pursuing a regular patent case under Section 271(a) … in the guise of a Hatch-Waxman case under Section 271(e)(2)," which "flies squarely in the face of … *Elan*"); A2456 at A2460 ("Mutual's ANDA … specifies that the SSA of Mutual's 7.5 mg temazepam product must be 'not less than 2.2 m2/g.' The Court has already ruled that a product that complies with Mutual's ANDA does not infringe.").

[5] Upon issuing this ruling, moreover, the court stated that it was based on arguments "parallel to the motions for summary judgment that the defendants have been trying to pursue … based upon the *Elan* analysis." A2219.

meters per gram. *See Bayer AG v. Elan Pharm. Res. Corp.*, 212 F.3d 1241, 1249 (Fed. Cir. 2000)." *Tyco*, 642 F.3d at 1371. Thus, as of Mutual's second summary judgment motion, there was little point in focusing on *Elan*. The remaining infringement issue was whether Tyco's on-the-market product directly infringed *under §271(a)*, where *Elan* was no longer relevant.

In ruling that "*Elan*'s controlling significance" was "clear" only in hindsight (A7), the district court also cited the parties' dispute over "the method to be used for the measurement of the particle surface area of temazepam," reasoning that this issue was not "straightforward." A8-9, A10. But as *Elan* explains, "factual issues as to whether [the generic] can comply with its specification … *are not material factual issues because 21 U.S.C. §331(d) prohibits* [*the generic*] *from selling any product that does not meet its ANDA's requirements*." *Elan*, 212 F.3d at 1250 (emphasis added). Where (as here) the ANDA "describes a 'well-defined compound,'" "'the ultimate question of infringement *is … straightforward*.'" *Id.* (citation omitted; emphasis added).

Indeed, the district court ignored its *own* earlier conclusion that the "dispute between experts on [this] obscure scientific point" was irrelevant in light of Mutual's ANDA. A2124. As the court had held, Tyco's arguments concerning testing methods "overlook the key inquiry that *Elan* requires" and, even if correct, "would still fail to show [infringement]." A2127. The court further noted "the salience of

*Elan*" and its "core holding" that "prior to FDA approval … the focus of the infringement question is 'on what the ANDA applicant will likely market'"—an inquiry "grounded in the ANDA application." A2126. Thus, even if the proper testing method remained relevant under *§271(a)*, it was immaterial under *§271(e)(2)*—Tyco's sole basis for obtaining a 30-month stay of FDA approval.

Nor was this a close call. As the district court observed:

- Tyco's briefs were "silent on the question";

- Tyco did not "present any evidence at the hearing to negate the conclusion";

- "Tyco's expert[] admitted that it was possible to manufacture temazepam with a SSA that conformed to the ANDA and did not infringe";

- "Tyco … did not address, except in passing, the fundamental issue of whether the ANDA specification in this case defines the compound in a manner that directly addresses the issue of infringement";

- "Tyco failed to offer persuasive evidence" that "the compound was not well-defined, within the meaning of *Elan*";

- "Tyco did not offer evidence to rebut" Mutual's "evidence that the ANDA specification in this case defines the compound in a manner that directly addresses the issue of infringement."

- "[T]his Court asked Tyco whether there was anything it had not presented in regard to the question of infringement under *Elan*, and Tyco answered in the negative."

A2121-22, A2127, A2128.

Having forcefully ruled for Mutual on infringement, the court below ignored its earlier analysis in addressing Mutual's sham litigation counterclaim. But as that

*Confidential Information Redacted*

analysis confirms, "Tyco did not offer evidence to rebut" *Elan*'s "core holding"—

Tyco was "silent." A2126-27, A2121. At a minimum, this raises a triable dispute

as to whether Tyco "could realistically expect to secure favorable relief" under

§271(e)(2) (*PRE*, 508 U.S. at 62), ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ ; *see also Teva Pharms. USA, Inc. v.*

*Abbott Labs.*, 580 F. Supp. 2d 345, 365 (D. Del. 2008) (denying summary judg-

ment because "a jury could find defendants' infringement allegations objectively

baseless" where "HMPC comprised only 2% by weight of Impax's product"—not

"enough HPMC to meet the [patent's 20%] weight percent limitation").[6]

### B. A reasonable fact-finder could further find that Tyco lacked a realistic prospect of success in defending its patent's validity.

The district court likewise erred in ruling that no reasonable factfinder could

conclude that Tyco lacked an objective basis to assert its patent's validity. As this

Court unanimously recognized in affirming summary judgment on invalidity, it is

---

[6] Tyco has not invoked the doctrine of equivalents. Nor could it. The doctrine does not permit disregarding a claim's "[m]eaningful structural and functional limitations." *Conopco Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994). The limitation "surface area of 0.65 to 1.1 $m^2/g$" is a clear "structural limitation," and treating Mutual's SSA as equivalent to Tyco's would eviscerate the limitation.

Nor has Tyco invoked *PRE*'s second prong. It argued that its "subjective motivation [was] immaterial" because it could win under the "objective prong." A4324 at A4350.

undisputed that (1) "the only limitation of the two '954 claims that was not fully disclosed by the prior art Restoril® is the lower dosage of temazepam"; (2) the prior art BNF reference taught doses of "5-15 mg" for "elderly patients"; (3) "two prior art publications discuss[ed] experimentation with 5 mg capsules"; and (4) "at the time the BNF was published, 5 mg temazepam hard capsules had been sold abroad for more than a decade."  642 F.3d at 1372, 1374.  Thus, as the district court put it, Tyco's supposed invention—"use of a 7.5 mg dose of temazepam—was not merely an *obvious* solution at the time of invention; it was a *known* solution." A3803 at A3818 (emphasis added).  Indeed, this Court and the district court characterized Tyco's arguments as "silly" and "incomprehensible."[7]  And the evidence demonstrates that Tyco knew this when it sued.

Below, however, the district court did not discuss its own prior conclusion that Mutual made a "strong showing of obviousness," or that "it is clear that [Tyco's] arguments are incorrect."  A3816, A3818.  Nor did it discuss this Court's obviousness decision.  Rather, the court simply reasoned (in one paragraph) that Tyco

---

[7] *See* 642 F.3d at 1373 n.3 (describing as "silly" the argument "that [Tyco's expert's] declaration should be interpreted to mean that the reference to '5-15 mg' did not disclose all dosages between 5 and 15 mg"); A3809 (finding it "somewhat incomprehensible that an expert can opine that a recognized publication, which has the purpose of directing practitioners to the appropriate use of medications, and which clearly states that doses in the range of 5mg to 15 mg may be used to treat insomnia in the elderly, does not teach the use of doses in that range for the treatment of insomnia").

41

could have expected success based on the "presumption of [patent] validity," the "clear and convincing evidence standard," and the fact that Tyco "merely acquired the patents" from Sandoz. A11, A12. These factors do not support affirmance.

*First*, the presumption of validity is "not substantive law" (*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983)), and if it were sufficient to support patent validity for antitrust purposes, that would effectively preclude sham litigation claims based on suits to enforce invalid patents. That is not the law. The "bad faith" assertion of invalid patents may support antitrust liability. *Handgards, Inc. v. Ethicon, Inc.* ("*Handgards I*"), 601 F.2d 986, 993 (9th Cir. 1979); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998).

Further, the district court's view is directly contrary to both its earlier ruling and this Court's obviousness decision, which note that the only obviousness issue was dosage and state: "Ordinarily, 'where there is a range disclosed in the prior art, and the claimed invention falls within that range, *there is a presumption of obviousness*.'" 642 F.3d at 1372 (citation omitted); A3810. The court never addressed this inconsistency.

*Second*, the court's reliance on the clear-and-convincing-evidence standard was equally misplaced. That procedural device likewise does not preclude proving invalidity, as this case confirms. 642 F.3d at 1377 ("Tyco has not overcome Mutual's clear and convincing showing of obviousness"); A3817. Here too, moreover,

42

if the court below were correct, suits to enforce invalid patents could never be a sham. *Contra Handgards, Inc. v. Ethicon, Inc.* ("*Handgards II*"), 743 F.2d 1282, 1288, 1293 (9th Cir. 1984).

*Third*, the district court erred in relying (without explanation) on the fact that Tyco "merely acquired the patents" from Sandoz. Mutual presented evidence that, when Tyco sued, it: (1) "knew of the 'Memo for the Record,'" which acknowledged that "'in Great Britain, temazepam doses from 5-15mg are recommended for geriatrics'" (A14, A15); and (2) knew, as Restoril's manufacturer, that "[t]he only physical feature distinguishing the [patents'] claims from the Restoril® 15 mg capsules is the amount of temazepam contained in the capsule" (642 F.3d at 1372). Tyco was thus aware of the same prior art teachings that both the district court and this Court held "would have been obvious for a person of ordinary skill in the art to combine." *Id.* at 1371. There is ample evidence to conclude that Tyco "had acquired sufficient information to indicate with certainty that the … patent was invalid on the basis of [a] prior invention." *Handgards II*, 743 F.2d at 1290 (upholding verdict of antitrust violation for bad-faith patent enforcement).

The decision below should therefore be reversed.

43

**II.    A reasonable factfinder could find that Tyco's citizen petition was a sham.**

The district court also erred in granting summary judgment to Tyco on Mutual's antitrust challenge to Tyco's citizen petition.  The court appeared to recognize that the "sham" exception to *Noerr-Pennington* immunity applies to baseless administrative petitions.  A12 n.1.  Yet it failed to apply the correct legal standard and ignored multiple facts precluding summary judgment.  Indeed, the court never even analyzed the petition, let alone FDA's decision rejecting it.

**A.    The district court failed to apply the proper legal standard.**

Below, Mutual argued that a citizen petition is a sham under *PRE* if it (1) is "objectively baseless" in that no reasonable petitioner "could realistically expect success" and (2) "conceals an attempt to interfere directly with the business relationships of a competitor … as an anticompetitive weapon."  A5510.  The district court, however, reasoned that "*PRE* is inapposite because it is expressly limited to litigation."  A12 & n.1.  The court appeared to conclude that the relevant inquiry is simply whether Tyco "abused the administrative process," and its discussion of that issue was cursory.  *Id.*  This was error.

As repeatedly held by the Third Circuit—whose law applies to this non-patent issue—courts "must" apply *PRE*'s "two-step test" to claims that administrative petitions are shams.  *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999); *Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Memorial Hosp.*,

185 F.3d 154, 158 & n.2 (3d Cir. 1999); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686 (2d Cir. 2009) (regional circuit law applies to claim that FDA citizen petition was a sham).  Indeed, "every court that has considered whether a petition to the FDA is entitled to *Noerr-Pennington* immunity has applied the *PRE* test."  *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 310 n.11 (E.D. Pa. 2011) (collecting cases).

### B.    Ample evidence shows that Tyco's petition was objectively baseless.

Under *PRE*, whether Tyco's citizen petition was a sham is clearly a triable issue.  The district court never even considered Mutual's evidence that Tyco "could not reasonably expect success on the merits."  *Cheminor*, 168 F.3d at 123 (citation omitted).  That evidence easily precludes summary judgment.

*First*, as FDA repeatedly observed, Tyco's petition "provided *no evidence* from clinical trials, pharmacokinetic studies, bioequivalence testing, or any other source" and instead "relie[d] *entirely on uncorroborated generalities and theoretical speculation*."  A6049 at A6055 (emphasis added).  Tyco's "only allegedly new information"—the "two-fold difference" in SSA between Mutual's product and Tyco's —was in fact "carefully examined" by FDA in tentatively approving Mutual's ANDA.  A6056.  But Tyco did "not provide[] evidence … to demonstrate that this difference is in fact relevant."  *Id*.

45

Nor could it. █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. FDA reached the same conclusion,

noting that SSA "commonly differs between different manufacturers' [products]"

without "affect[ing] the [drug's] bioavailability." A6056. And given FDA's

"f[inding] that [Tyco's] citizen petition had no convincing evidence and lacked any

basis," Mutual "could plausibly show the citizen petition to have been a sham." *In

re DDAVP*, 585 F.3d at 694 (internal quotations omitted).

*Second*, the requirements that Tyco sought to impose on Mutual's ANDA far

exceeded the standard for proving bioequivalence, which is the only clinical re-

quirement for generics. As Mutual's expert explained, "the pharmacokinetic pa-

rameters recommended in Tyco's Citizen Petition were not relevant to whether two

products are bioequivalent." A6400 at A6428, A6430-37. Indeed, some of Tyco's

proposed criteria were not only clinically irrelevant, but also inherently variable

and impossible to measure precisely. A6438. As Mutual's expert concluded, Ty-

co's petition had no scientific basis and denial was the only result Tyco reasonably

could have expected. A6402-03.

Even assuming the criteria were relevant, Tyco knew that FDA had already

determined that Mutual's temazepam *is* bioequivalent to Restoril, a finding that

was based on extensive dissolution studies. A6429-30. Tyco did not even *attempt*

46

to challenge those studies, or FDA's analysis thereof.   Accordingly, there is "a genuine issue of fact as to whether there was a realistic chance that the FDA would require ANDA applicants to provide more data than was necessary" to determine bioequivalence. *Flonase*, 795 F. Supp. 2d at 314 (denying summary judgment).

*Finally*, Tyco's petition had no realistic chance of success because it sought relief contrary to FDA's practices.   As FDA explained, it has mandated additional pharmacokinetic criteria beyond standard bioequivalence only "[i]n very rare instances" where drugs "involved complex extended-release or otherwise modified-release products for which there was a known and clinically significant connection between release characteristics and clinical performance."   A6054-55 n.16.   But "Temazepam is not such a drug."   *Id.*   Similarly, FDA summarily denied Tyco's request to designate temazepam as a drug for which bioequivalence could not be determined, holding that this designation "would not apply … to *any* generic product that [FDA] was approving under the 1984 Hatch-Waxman Amendments, as *all* such generic products must satisfy bioequivalence requirements."   A6057 n.23 (emphasis added).

FDA ultimately concluded that Tyco was requesting relief that would contravene "more than two decades" of FDA practice.   A6053.   That alone was sufficient to avoid summary judgment.   Where a party "requested relief that was contrary to FDA practice," that raises a triable issue as to "whether the … Petition was

47

objectively baseless." *Flonase*, 795 F. Supp. 2d at 316; *see also La. Wholesale Drug Co. v. Sanofi-Aventis*, 2008 WL 4580016, at *4 (S.D.N.Y. Oct. 14, 2008) (denying summary judgment where petitioner made requests "contrary to FDA regulations, and practice"). The court below erred in concluding otherwise.

### C.    Ample evidence shows that Tyco filed the petition to prevent lawful competition from Mutual.

The district court also erred in holding that Mutual "sa[id] nothing to support an inference that [Tyco's petition] was an attempt to interfere directly with the business relationships of a competitor." A12. Mutual has consistently maintained that Tyco's petition "was submitted solely for the purpose of delaying FDA approval of Mutual's ANDA." A3826 at A3871; *accord* A5946 at A5530. The record here would easily allow a reasonable factfinder to find that Tyco filed its petition for anticompetitive reasons. And "questions of subjective intent so rarely can be decided by summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982).

Tyco's anticompetitive intent is shown by the fact that, as FDA recognized, the petition was "specifically" focused on arguing "that the Mutual product is not bioequivalent to Restoril because [of] a significantly greater [SSA] of its active ingredient." A6049-50. But when Tyco filed its petition, it had known the SSA of Mutual's product for 2.5 years—since February 2007, when it received Mutual's

48

notice letter—and Mutual publicly disclosed that information in January 2008. A5981; A200 at A205.  If Tyco had genuinely been concerned about Mutual's SSA—and the purported safety concerns it raised—it would have filed a petition as soon as it saw the specification.  Similarly, Tyco had years to raise its supposed concerns about FDA's bioequivalence criteria for temazepam, which FDA has used "for more than two decades."  A6053.  Instead, *Tyco filed its petition just one week before the 30-month stay expired*—right after the district court denied its motions to extend the stay and to enter an injunction.

The timing of Tyco's petition alone indicates that it sought to "cause[] a delay in generic competition," satisfying *PRE*'s subjective prong.  *DDAVP*, 585 F.3d at 685.  Tyco's delay extended its monopoly by 27 days.  And since "there was in effect nothing else to block" FDA's final approval of Mutual's ANDA, "at a minimum [there] is a jury question" as to Tyco's motivation for filing the petition then. *La. Wholesale*, 2008 WL 4580016, at *5.

Moreover, a jury could easily conclude that Tyco subjectively *knew* its citizen petition was meritless when it submitted it to FDA.

*Confidential Information Redacted*

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████. Reversal is warranted.

### III. The district court erred in granting summary judgment to Tyco on Mutual's *Walker Process* fraud claim.

The district court also erred in granting summary judgment to Tyco on Mutual's *Walker Process* fraud claim. *Walker Process* created an exception to the "general rule" that "behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004) (citing *Walker Process*, 382 U.S. at 174), *rev'd on other grounds*, 546 U.S. 394 (2006). "[E]nforcement of a patent procured by fraud on the Patent Office may be violative of §2 of the Sherman Act" because the public has a "'paramount interest in seeing that patent monopolies spring from backgrounds free from fraud.'" 382 U.S. at 174, 176-77 (citation omitted).[8]

*Walker Process* fraud requires proof of "(1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive

---

[8] *Walker Process* and *PRE* "provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws," and liability for *Walker Process* fraud "can be imposed without the additional sham inquiry required under *PRE*." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998).

50

the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted." *C.R. Bard*, 157 F.3d at 1364.  Thus, Mutual must prove that Sandoz had a specific intent to defraud the PTO, and that its misstatements were material to patentability.

Where "the defendant was not the original patent applicant," *Walker Process* also requires proof that the defendant "had been enforcing the patent with *knowledge of the fraudulent manner in which it was obtained*."  382 U.S. at 179 (Harlan, J., concurring) (emphasis added); *accord Nobelpharma*, 141 F.3d at 1069.

As shown below, the record clearly presents disputed factual issues both as to whether Sandoz intentionally made material misstatements to the PTO and as to whether Tyco knew this when it sued.  The district court did not reach the intent and materiality elements.  It focused solely on Tyco's knowledge, concluding that while "[a] reasonable finder of fact could infer from this evidence that Plaintiffs knew at the time they filed the infringement claims that the patents might have validity vulnerabilities," there was insufficient evidence that Tyco knew of the fraud. A15 & n.3.  But this holding ignored key evidence and failed to recognize that knowledge may—and often must—be inferred from circumstantial evidence.

*Confidential Information Redacted*

**A.    The record shows that Sandoz committed fraud in procuring the Tyco patents.**

On the first two *Walker Process* elements (intent and materiality), Mutual presented substantial evidence that Sandoz knowingly and intentionally made at least two material misrepresentations to the PTO in procuring the Tyco patents. First, it concealed that the claimed invention used the same SSA and particle size as the higher-dose prior art Restoril capsules ███████████████████ ███████████████████████████████ Second, it concealed that temazepam doses between 5 and 15mg were known and had been used in England to treat insomnia in the elderly for years—a fact confirmed by Sandoz's Memo for the Record.  A5826 at A5828; A6483-85.  According to Sandoz's representations to the examiner, however, it "found a totally unexpected use [*i.e.*, treating insomnia] for a 7.5 milligram capsule."  A6754 at A6758.

This Court has already found these facts material to patentability.  In its obviousness decision, the Court explained that the SSA and particle size of the prior art Restoril capsules showed both that the only limitation of the Tyco patents "that was not fully disclosed" was "the lower dosage of temazepam," and that the prior use of 5-15mg temazepam to treat insomnia in combination with the other physical characteristics of the prior art Restoril capsules rendered the patents obvious.  642

*Confidential Information Redacted*

F.3d at 1372 & n.2.  The court below likewise found that "the applicant's alleged omissions could conceivably meet the standard of 'but for' causation."  A16.

A reasonable factfinder could also infer that Sandoz intended to deceive the PTO through these misrepresentations.  "A false or clearly misleading prosecution statement may permit an inference that the statement was made with deceptive intent" where there is evidence that "a patent applicant knew one fact and presented another."  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007).  And "a fraudulent omission can be just as reprehensible as a fraudulent misrepresentation."  *Nobelpharma*, 141 F.3d at 1070.

Here, Mutual presented evidence that Sandoz ▮▮▮▮ knew that Restoril 15mg and 30mg used the same SSA and particle size as are disclosed in the Tyco patents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Further, to overcome a rejection based on other prior art, Sandoz represented that the physical characteristics of the temazepam it claimed were different from the temazepam disclosed in the prior art.  A6483, A6751, A6754 at A6757.

In addition, Sandoz was aware (but did not disclose) that the use of lower-dose temazepam was *known* as of its 1986 patent application.  As this Court has noted, Sandoz's 1984 "Memo for the Record" memorialized its communications

53

with FDA and acknowledged that, as the 1983 BNF reference recounted, "'in Great Britain, temazepam doses from 5-15mg are recommended for geriatrics.'" *Tyco*, 642 F.3d at 1372 n.2. █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████.

This evidence is more than sufficient to create a triable factual issue.

## B.    There is ample evidence from which a jury could infer that Tyco knew about Sandoz's fraud.

On the third *Walker Process* fraud element, the element addressed by the district court, "[t]he plaintiff in the patent infringement suit must also have been aware of the fraud when bringing suit." *Nobelpharma*, 141 F.3d at 1069. Mutual's submission also establishes a factual dispute on that issue.[9]

---

[9] To our knowledge, no court has addressed whether constructive knowledge is sufficient to meet this requirement. But as leading antitrust commentators have explained, "[t]he monopolist who seeks to enforce a patent acquired from an applicant who misbehaved" may be liable under §2 of the Sherman Act if "it *knew, should have known, or lacked due care in failing to learn* of the impropriety before the Patent Office." Areeda & Hovenkamp, *Antitrust Law* ¶705k (emphasis added). Moreover, constructive knowledge satisfies the knowledge requirement in a variety of contexts. *E.g.*, *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998) ("constructive knowledge of the infringement may be imputed to the patentee" for purposes of laches). Ultimately, however, this Court need not resolve this issue, as there is sufficient evidence of Tyco's actual knowledge of the fraud to defeat summary judgment under either standard.

### 1. Actual knowledge may—and typically must—be proven by circumstantial evidence.

Knowledge not only "can be inferred from circumstantial evidence" (*Staples v. United States*, 511 U.S. 600, 615 n.11 (1994)), but indeed "must almost always be proved[] by circumstantial evidence" (*United States v. Santos*, 553 U.S. 507, 521 (2008)). Accordingly, plaintiffs need not present direct evidence (*e.g.*, an admission) to support an inference of actual knowledge. *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1380 (Fed. Cir. 2013); *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1376-77 (Fed. Cir. 2010).

For example, in induced infringement cases—which require proof that the defendant knew of the infringed patent—"direct evidence of knowledge is not required"; the knowledge requirement may be satisfied without evidence that "any Defendant possessed the [patent] on the date it issued" or "admit[ted] it had actual knowledge of the [patent]." *SynQor*, 709 F.3d at 1380. This Court has affirmed the denial of JMOL on this issue even where "the record show[ed] no direct evidence that [the defendant] had actual knowledge of the patent." *Montgomery Ward*, 594 F.3d at 1376-77. The same standards apply here.

### 2. The record shows that Tyco had access to the evidence of Sandoz's fraud and was on notice that the patents were "vulnerable to a validity challenge."

As Mutual's evidence shows, Tyco not only had access to the files containing the evidence of Sandoz's fraud, but also had carefully reviewed them on sever

55

*Confidential Information Redacted*

al occasions—both upon purchase of the Restoril franchise and during its pre-suit investigation.  Moreover, Tyco was aware of much (if not all) of their contents.

█████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████. Nor is that surprising:  Tyco was buying a patented drug franchise and needed to make an appropriate offer—which required knowing what was available in the prior art and ultimately the strength of the relevant patents.  ██████████████████████████████

█████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████.

*Confidential Information Redacted*

Importantly, the supplemental NDA contained Sandoz's correspondence with FDA, including the Memo for the Record reflecting that FDA had informed Sandoz that "in Great Britain, temazepam doses from 5-15mg are recommended for geriatrics" ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████.

Mutual's evidence also shows that, before filing suit, Tyco was on notice that the PTO had allowed the patent claims based on a mistaken belief that the disclosed SSA and particle size were novel. As Mutual's notice letter stated, the examiner allowed the claims based on the belief that the *combination* of the lower dosage with crystalline temazepam having a novel SSA was non-obvious:

> In the Examiner's Statement of Reasons for Allowance, the Examiner noted that it would require an improper hindsight reconstruction [*i.e.*, not obvious] to reduce the higher temazepam prior art dosage to effectively treat insomnia *with the selected particle size* of crystalline temazepam in a hard gelatin capsule with the claimed low dosage range.

A5971 at A5976 (emphasis added); *see also* A6482-83. Mutual's letter also informed Tyco that Sandoz had overcome a rejection over the prior art disclosing use of a lower dose of temazepam. A5979. And it is quite implausible that Tyco—led

57

by a patent lawyer ████████████████████████████████████

███████████████████—did not appreciate that the claimed invention had the

very same SSA as the prior art ██████████████████████████████

█████████████████████████

The district court nonetheless ignored much of this evidence and focused

solely on the fact that Tyco had read the patent prosecution histories and knew of

the Memo for the Record.  That was error.

### 3.    A reasonable factfinder could infer that Tyco knew of the fraud.

Multiple facts support a reasonable inference that Tyco knew of the fraud.

A party's knowledge is "a question of fact subject to demonstration in the usual

ways, including inference from circumstantial evidence, … and a factfinder may

conclude that a [party] knew of a substantial risk from the very fact that the risk

was obvious."  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citation omitted).

Further, "circumstances suggest[ing] that the [party] being sued had been exposed

to information concerning the risk" is "sufficient to permit a trier of fact to find

that the [party] had actual knowledge of the risk.'"  *Id*. at 842-43.  Here, a factfind-

er could infer knowledge from the simple fact that ████████████████████████

Tyco reviewed documents establishing Sandoz's fraud.

*Confidential Information Redacted*

Numerous courts have held that a factfinder may infer knowledge from a defendant's exposure to information from which that knowledge can be acquired. *See Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 452 (N.D. Cal. 2012) (finding a genuine factual issue as to defendant's actual knowledge of fraud in part because its "typical due diligence" review "may well have imparted the knowledge"); *Glenn Const. Co., LLC v. Bell Aerospace Servs., Inc.*, 785 F. Supp. 2d 1258, 1275-76 (M.D. Ala. 2011). "Actual knowledge does not 'require proof that the individual [parties] actually saw or read the documents that disclosed' the allegedly harmful [information]." *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 571 (6th Cir. 2010) (rejecting argument that providing access to documents "at most, would amount to *constructive* knowledge, … not *actual* knowledge"). Further, the "failure to read … documents" to which one was exposed "will not shield them from having actual knowledge of the documents' terms." *Id*.

Here, there is far more than evidence that Tyco had access or exposure to the relevant documents. There is undisputed evidence that Tyco ███████ reviewed them ████████████████████████████████████████████████

████████████████

Similarly, a jury could infer knowledge from evidence that Tyco was aware of a significant risk that Sandoz had engaged in fraud and was deliberately indifferent to the risk. "[T]he standard of deliberate indifference of a known risk is not

different from actual knowledge, but is a form of actual knowledge." *SEB*, 594 F.3d at 1377. Mutual's notice letter informed Tyco that the examiner had allowed the patents based on a mistaken belief that the disclosed SSA and particle size were novel. As the manufacturer of both the higher-dose Restoril 15mg and 30mg and the lower-dose Restoril 7.5mg, however, Tyco knew the only difference between the two was the lower dosage. More importantly, it knew Sandoz would have known this fact during prosecution and would have had a legal duty to inform the examiner of his error. *Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158, 182 (Fed. Cir. 2005).

Moreover, Tyco had possession and knowledge of the Memo for the Record, which noted that 5-15mg temazepam had been known and used in England for years before Sandoz sought a patent. Indeed, the court below acknowledged that this evidence could suggest that "the patents might be vulnerable to a validity challenge." A15. At a minimum, therefore, the evidence is sufficient for a factfinder to infer that Tyco was deliberately indifferent to the substantial risk that Sandoz committed fraud in procuring the patents.

## CONCLUSION

The district court's judgment should be reversed, and the case remanded for trial on Mutual's antitrust counterclaims.

60

Respectfully submitted,

*/s/ Steffen N. Johnson*

JAMES F. HURST                             STEFFEN N. JOHNSON
*Winston & Strawn LLP*                     CHARLES B. KLEIN
*35 West Wacker Drive*                     *Winston & Strawn LLP*
*Chicago, IL 60601*                        *1700 K Street N.W.*
*(312) 558-5600*                           *Washington, D.C. 20006*
*jhurst@winston.com*                       *(202) 282-5000*
                                           *sjohnson@winston.com*
                                           *cklein@winston.com*

*Counsel for Defendants-Appellants*

JULY 5, 2013

61

## ADDENDUM

April 30, 2013 Consent Order of Final Judgment .....................................................A1

January 18, 2013 Opinion & Order.........................................................................A3

U.S. Patent No. 5,030,632...............................................................................A3982

U.S. Patent No. 5,211,954...............................................................................A3986

U.S. Patent No. 5,326,758...............................................................................A3990

U.S. Patent No. 5,629,310...............................................................................A3994

*CL*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

————————————————— x
                               :

TYCO HEALTHCARE GROUP LP,      :    Honorable Stanley R. Chesler, U.S.D.J.
and MALLINCKRODT INC.,           :

                               :    Civil Action No. 07 CV 1299 (SRC) (CLW)

         Plaintiffs,             :

                               :

v.                                  :    **CONSENT ORDER**
                                 :    **OF FINAL JUDGMENT**

MUTUAL PHARMACEUTICAL       :
COMPANY, INC. and UNITED         :
RESEARCH LABORATORIES, INC.,    :

                                 :

         Defendants.            :

                                 :
————————————————— x

**THIS MATTER**, being opened to the Court by Winston & Strawn LLP, attorneys for Defendants, and McCarter & English LLP, attorneys for Plaintiffs, by way of Consent Order of Final Judgment; and

**WHEREAS**, on January 18, 2013, the Court issued an opinion and order (D.I. 501) granting Plaintiffs' motion for partial summary judgment (D.I. 461) as to the Sixth, Seventh, Eighth, Ninth and Tenth Counts of the counterclaims in Defendants' Third Amended Answer and Counterclaims (D.I. 409), and denying the motion as to the Fifth Count; and

**WHEREAS**, the Fifth Count of Defendants' counterclaims is the sole remaining cause of action in this case; and

**WHEREAS**, the parties have conferred and now desire to streamline this litigation by dismissing the Fifth Count of Defendants' counterclaims with prejudice so that the Court can enter a final judgment in the case; and all parties having consented to the form and entry of this Consent Order for Final Judgment, and for good cause shown;

1

**A1**

**IT IS** on this 30th day of April, 2013,

**ORDERED**, as follows:

1. The Fifth Count of Defendants' Third Amended Answer and Counterclaims (D.I. 409) is hereby DISMISSED WITH PREJUDICE, with each party bearing its own costs and legal fees; and

2. This dismissal is without prejudice to, and does not waive, Defendants' rights to: (a) appeal the judgment against them dismissing Defendants' antitrust and unfair competition counterclaims in the Sixth, Seventh, Eighth, Ninth and Tenth Counts of the Third Amended Answer and Counterclaims; and (b), if the judgment of dismissal is reversed, to try those Counts to a jury that are so triable upon remand; and

3. This Order shall constitute the final judgment in this case.

_____
Honorable Stanley R. Chesler, U.S.D.J

We hereby consent to the form and entry of this Consent Order For Final Judgment:

MCCARTER & ENGLISH, LLP

By: ___s/ John E. Flaherty_____
   John E. Flaherty
   Jonathan M.H. Short
   Four Gateway Center
   100 Mulberry Street
   Newark, New Jersey 07102
   (973) 622-4444

   *Attorneys for Plaintiffs/Counterclaim-*
   *Defendants Tyco Healthcare Group LP*
   *and Mallinckrodt Inc.*

WINSTON & STRAWN LLP

By: ___s/ James S. Richter_____
   James S. Richter
   Jeffrey P. Catenacci
   One Riverfront Plaza, Suite 730
   Newark, New Jersey 07102
   (973) 848-7676

   *Attorneys for Defendants/Counterclaim-*
   *Plaintiffs   Mutual   Pharmaceutical*
   *Company,  Inc.  and  United  Research*
   *Laboratories, Inc.*

**A2**

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|                                                        |                              |
| ------------------------------------------------------ | ---------------------------- |
| TYCO HEALTHCARE GROUP LP and MALLINCKRODT INC.,        |                              |
| Plaintiffs,                                            |                              |
| v.                                                     | Civil Action No. 07-1299 (SRC) |
| MUTUAL PHARMACEUTICAL COMPANY, INC. and UNITED RESEARCH LABORATORIES, INC., | **OPINION & ORDER**  |
| Defendants.                                            |                              |

<u>**CHESLER**, **U.S.D.J.**</u>

This matter comes before the Court on the motion for partial summary judgment by

Plaintiffs Tyco Healthcare Group LP and Mallinckrodt Inc. (collectively, "Tyco"). The

Defendants are Mutual Pharmaceutical Company, Inc. and United Research Laboratories, Inc.

(collectively, "Mutual"). For the reasons stated below, the motion for partial summary judgment

will be granted in part and denied in part.

<u>**BACKGROUND**</u>

This case arises out of an action for patent infringement, which has been described in

previous Opinions and need not be repeated here. The instant motion concerns the Fifth through

Tenth Count of the Counterclaims in the Third Amended Answer. These Counterclaims are: 1)

Fifth - inequitable conduct; 2) Sixth - unlawful attempted monopolization in violation of the

Sherman Act; 3) Seventh - unlawful monopolization in violation of the Sherman Act; 4) Eighth -

**A3**

common law unfair competition; 5) Ninth - attempted monopolization in violation of the New Jersey Antitrust Act; and 6) Tenth - monopolization in violation of the New Jersey Antitrust Act. Specifically, the motion for partial summary judgment seeks judgment on the availability of the sham litigation exception and the Walker Process fraud exception to Noerr-Pennington immunity in regard to these claims.

<div align="center">

**APPLICABLE LEGAL STANDARDS**

</div>

**I.      Motion for summary judgment**

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).  "[W]ith

<div align="center">2</div>

<div align="center">**A4**</div>

respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set out specific facts showing a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

3

**A5**

## ANALYSIS

### I.  Plaintiffs' motion for partial summary judgment

Plaintiffs move for partial summary judgment on the availability of two exceptions to the principle of Noerr-Pennington immunity in regard to Mutuals' counterclaims which assert violations of antitrust laws.  In brief, the counterclaims assert various kinds of anticompetitive conduct.  The parties do not dispute the relevant basic legal principles.  Under the doctrine known as Noerr-Pennington immunity, a private party is shielded from antitust liability under the Sherman Act when petitioning the government for the enforcement of laws.  Eastern R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961).  The parties also agree on two exceptions to this rule, the sham litigation exception and the Walker Process fraud exception.  As stated by the Federal Circuit:

> A patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965), or (2) that the infringement suit was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).

Nobelpharma Ab v. Implant Innovations, 141 F.3d 1059, 1068 (Fed. Cir. 1998).

Under the sham exception, Noerr-Pennington immunity does not shield activity which is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor ."  Noerr, 365 U.S. at 144.   In Prof'l Real Estate Investors v. Columbia Pictures Indus., 508 U.S. 49, 60-61 (1993) (citations omitted) ("PRE"), the Supreme Court established a two-part test to determine whether the sham exception applies:

4

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail.  Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.  Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use [of] the governmental process -- as opposed to the outcome of that process -- as an anticompetitive weapon.  This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

Plaintiffs contend that Mutual cannot prove that the instant patent infringement litigation is a sham under an objective standard.

The dispute between the parties over the sham exception turns on the determination of whether the patent infringement suit was "reasonably calculated to elicit a favorable outcome." Mutual argues, in brief, that, as this Court held in the Opinion of August 4, 2009, under the Federal Circuit's decision in Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1248 (Fed. Cir. 2000), a product manufactured to the specifications contained in Mutual's ANDA could not literally infringe the patent at issue.  Mutual argues that, prior to initiating this litigation, Plaintiffs knew about Elan, the ANDA, and the patent, and could not have therefore reasonably believed that their patent infringement claim could succeed.

Defendants appear to suggest that it was obvious that Elan was the relevant controlling authority and that, applied to the facts of this case, this Court's conclusions should have been expected.   The Court finds it curious that, if this was so obvious, Defendants never moved for summary judgment of non-infringement on that theory.  It is only from the perspective of the rear view mirror, however, that Elan's controlling significance is clear.  There is no reason to believe

that it should have been so clear in 2007. At that point, what was known to Plaintiffs was that the ANDA and the patents referred to methods of measuring SSA that were not identical. (See Defs.' Resp. 56.1 Stmt. ¶¶ 11-16.) This fact alone is sufficient to raise the possibility that a court would not conclude that Elan precluded a finding of infringement. Uncertainties over these factual issues made the applicability of Elan unclear.

In reply, Plaintiffs point out that PRE requires an antitrust plaintiff to prove that the antitrust defendant lacked probable cause to initiate suit. PRE, 508 U.S. at 62. "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that [a] claim may be held valid upon adjudication." Id. at 62-63.

Moreover, Plaintiffs contend, the facts do not support Mutual's characterization of Plaintiffs' patent infringement claims as obviously impossible. Plaintiffs point to evidence that: 1) measurement of particle surface area is dependent on the measurement method used; 2) Mutual's ANDA used a measurement method different from that used by Tyco; and 3) Tyco had no access to any sample of Mutual's generic temazepam to test at the time that the period for filing the patent infringement suit pursuant to Hatch-Waxman had expired.

As Plaintiffs note, on July 29, 2009, this Court held a preliminary injunction hearing at which both parties had experts testify about the effect of the particle surface area measurement method on the measurement. And, as Plaintiffs also note, in the Opinion of August 4, 2009, this Court stated:

> At the hearing, Dr. Luk testified that the SSA test should be performed with outgassing at 105ºC, not 40ºC. In opposition, Dr. Williams testified that the SSA test should be performed with outgassing at 40ºC, not 105ºC. The parties appear not to dispute that the samples manifest an infringing SSA when tested with outgassing at 105ºC, but a noninfringing SSA when tested with outgassing at

6

**A8**

40ºC.

Thus, were this Court to agree that the infringement analysis at this juncture should be based on product samples rather than ANDA specifications, this Court would have before it a factual dispute between experts on an obscure scientific point, the temperature at which outgassing should be conducted in a particular chemical analysis. Such a factual dispute would likely need to be resolved at trial by a battle of the experts. At the preliminary injunction hearing, this Court heard detailed testimony from each party's expert. Tyco's expert, Dr. Luk, did not persuasively articulate a basis for selecting 105ºC as the proper outgassing temperature. This Court observes that, according to Dr. Luk, Tyco never actually conducted any tests at 40ºC. Dr. Luk rejected Dr. Williams' tests at 40ºC solely because he viewed the variation in results as evidence of unreliability in the testing methodology. Dr. Williams, on the other hand, not only tested Mutual's proposed product at a wide range of temperatures, but also tested the Sandoz temazepam product at the same range. (Williams 7/22/09 Decl. ¶ 18.) The results suggested to Dr. Williams that increasing the outgassing temperature had no significant effect on the measured surface area of the Sandoz temazepam, but caused a substantial decrease in the measured surface area of the Mutual temazepam. (Id.) This Court found Dr. Williams' opinion to be based on more comprehensive study and therefore more persuasive and deserving of greater weight.

Having heard the evidence at the preliminary injunction hearing, and having weighed it, this Court does not find Tyco's evidence sufficiently persuasive to conclude that Tyco is likely to prove infringement by a preponderance of the evidence at trial. To the contrary, this Court found that Mutual's expert raised substantial questions about the strength of Tyco's infringement case. Dr. Williams cited a number of bases for his conclusion that Tyco's SSA measurements were inaccurate because the outgassing temperature changed the SSA of the particles being tested. Dr. Williams' testimony also constitutes substantial evidence that Mutual's SSA measurement method gives accurate results.

(Opinion of August 4, 2009 at 8-9.) If anything is clear from this, it is that the method to be used

for the measurement of the particle surface area of temazepam is a subject on which scientific

experts could and did disagree.

In their responsive L. Civ. R. 56.1 statement, Defendants concede that they needed to get

multiple SSA measurements done on multiple batches of temazepam before they got a batch of

temazepam that met the specifications of the ANDA.  (Defs.' 56.1 Stmt. ¶¶ 25-35.)  Defendants

admit that, on three occasions, the testing laboratory obtained measurements of the SSA of the

temazepam sample that fell within the SSA range specified in the patent at issue.  (Id. at ¶ 33.)  In

view of these concessions, it is clear, as Plaintiffs contend, that SSA measurement is far from

being a straightforward matter.

      As the parties have noted in their arguments, this Court ultimately concluded that

Defendants' ANDA unambiguously specifies a non-infringing SSA and thus mandates a finding

of non-infringement.  Nonetheless, "a court must resist the understandable temptation to engage

in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been

unreasonable or without foundation."  PRE, 508 U.S. at 61 n.5.

      Rather, as Plaintiffs have strenuously argued, Plaintiffs are entitled to summary judgment

unless Defendants have demonstrated a contested issue of material fact concerning whether or

not Plaintiffs had a "reasonable belief that there is a chance that [a] claim may be held valid upon

adjudication."  Id. at 62-63.  In the context of the infringement issues in this case, PRE would

require summary judgment for Plaintiffs unless Defendants demonstrate that there is a contested

issue of material fact as to whether Plaintiffs had a reasonable belief that there was a *chance* that

Elan would not control the outcome of this case.  "The existence of probable cause— e.g., where

the law is unsettled, the action is arguably warranted by existing law, or there is an objectively

good faith argument for extending existing law—precludes a sham litigation finding."  ERBE

Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1292 (Fed. Cir. 2010).  At the time

the Complaint was filed, a reasonable litigant could have reasonably believed that Elan might not

determine the outcome of the infringement action.

<center>8</center>

Defendants bear the burden of proof that the patent infringement claims are sham litigation to cover anticompetitive activity, and they must first show that the claims are objectively meritless.  As the party moving for summary judgment who does not bear the burden of proof at trial, Plaintiffs satisfy their initial summary judgment burden by pointing to the absence of evidence to support Defendants' case, and the burden then shifts to Defendants to point to evidence sufficient to prove their case at trial.  Defendants have failed to do so.  On the present record, this Court finds no disputes over any of the underlying predicate facts, and this Court decides probable cause as a matter of law.  PRE, 508 U.S. at 63.  Defendants have failed to point to evidence sufficient to persuade this Court that Plaintiffs lacked probable cause to bring a patent infringement suit.  Defendants have therefore failed to defeat Plaintiffs' motion for summary judgment as to the sham litigation exception to Noerr-Pennington immunity.

Defendants next argue that no reasonable litigant could have expected that the Tyco patents could withstand its obviousness and inventorship challenges.  This is a surprising argument, given the presumption of validity of an issued patent and a challenger's burden of proof of invalidity by clear and convincing evidence.  Defendants, however, overlook the clear and convincing evidence standard, and dismiss the presumption of validity argument with an undiscussed citation to a 1984 Ninth Circuit case, which stands for the unremarkable proposition that a patentee who files a patent infringement suit knowing the patent to be invalid acts in bad faith.  Handgards, Inc. v. Ethicon, Inc., 743 F.2d 1282, 1289 (9th Cir. 1984).  Defendants have simply failed to submit evidence sufficient to demonstrate a material factual question about whether Plaintiffs objectively had a reasonable basis to believe that they had a *chance* to succeed, given the presumption of validity.  All Defendants have shown is that Plaintiffs had notice of

9

**A11**

issues which could be raised, and were raised, by Defendants, including the issue of obviousness on which Defendants ultimately prevailed. Defendants have not, however, engaged in a serious effort to demonstrate that Plaintiffs lacked probable cause to believe that they were asserting valid patents, particularly given that Plaintiffs were not the original patentees and merely acquired the patents from another pharmaceutical company.

Defendants argue as well that Tyco's "Citizen's Petition" to the FDA was a sham. Defendants' very brief treatment of this argument does not explain its legal basis, nor cite any authority regarding non-litigation petitions. The opposition brief's "Legal Standards" section references only Noerr and PRE, and PRE is inapposite because it is expressly limited to litigation, and a citizen's petition to the FDA is not litigation. 508 U.S. at 51. It is true that Noerr-Pennington immunity does not shield activity which is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."[1] Noerr, 365 U.S. at 144. Defendants assert only that the petition was a sham, and say nothing to support an inference that it was an attempt to interfere directly with the business relationships of a competitor. Rather, Defendants try to stand the law on its head and shift the burden of proof here to Plaintiffs, arguing that Plaintiffs have failed to show that it was not a sham. This does not fly. Defendants bear the burden of proof here, and they have not met it.

---

[1] Defendants fail to even articulate, much less justify, the legal standard that this Court should apply to non-litigation petitions. Certainly the Supreme Court's decision in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972), and its discussion of that decision in PRE, 508 U.S. at 58, and City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 382 (1991), are highly relevant. In Motor Transport, the Court stated that it was difficult to draw the line between legitimate petitions to administrative agencies and violations of the antitrust laws, and that cases of "abuse" of administrative processes should not acquire immunity. 404 U.S. at 513. Defendants have neither argued nor presented evidence which would support an inference that, in filing the Citizen's Petition, Plaintiffs abused the administrative process.

Moreover, this Court will not allow a party to defeat a motion for summary judgment by tossing out a fragment of a legal theory. To defeat a motion for summary judgment, the nonmovant with the burden of proof must show that there is a genuine issue for trial. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Assuming that any factual questions are resolved in Defendants' favor, Defendants have not shown that, applying the law to the facts, they could prevail at trial on the issue of whether the Citizen's Petition was a sham. As to the Citizen's Petition, Defendants have failed to defeat Plaintiffs' motion for summary judgment, which will be granted.

As to the Walker Process fraud exception, Defendants must prove that "the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*." Nobelpharma, 141 F.3d at 1068. "The Supreme Court in *Walker Process* . . . held that antitrust liability may attach when a party uses a patent to obtain or preserve a monopoly if the patent was procured through intentional fraud on the Patent and Trademark Office." Ritz Camera & Image, LLC v. Sandisk Corp., 700 F.3d 503, 505 (Fed. Cir. 2012). In deciding this question, this Court applies the law of the Federal Circuit. Nobelpharma, 141 F.3d at 1067. Here, again, Plaintiffs satisfy their initial summary judgment burden by pointing to the absence of evidence to prove Defendants' case, and the burden then shifts to Defendants.

"The plaintiff in the patent infringement suit must also have been aware of the fraud when bringing suit." Nobelpharma, 141 F.3d at 1069. Indeed, Defendants contend that Tyco knew that the patents were obtained through fraud. Mutual's case on this point is simply that Tyco, when it purchased the patents from Sandoz, had done a due diligence investigation and had

reviewed the patents' prosecution histories.

This evidence is not sufficient to persuade a reasonable finder of fact that Plaintiffs knew that the patents had been procured by knowing and willful fraud. The Federal Circuit has held that a showing of fraud for the purpose of antitrust violation involves "a rigorous standard of deceit:"

> [T]he road to the Patent Office is so tortuous and patent litigation is usually so complex, that 'knowing and willful fraud' as the term is used in *Walker* can mean no less than clear, convincing proof of intentional fraud involving affirmative dishonesty, a deliberately planned and carefully executed scheme to defraud the Patent Office.

C.R. Bard v. M3 Sys., 157 F.3d 1340, 1364 (Fed. Cir. 1998) (quoting Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 996 (9th Cir. 1979)). Thus, Defendants must point to evidence that, as of March 20, 2007, the date that Plaintiffs filed the Complaint, Plaintiffs knew that Sandoz had procured the patents through a deliberately planned and carefully executed scheme to defraud the Patent Office.

Defendants' evidence falls far short of this. Defendants point to evidence supporting two factual assertions: 1) Plaintiffs had read the patents' prosecution histories; and 2) Plaintiffs knew of the "Memo for the Record" (the "Memo"). This does not amount to even a mere scintilla of evidence that Plaintiffs knew of a deliberately planned and carefully executed scheme to defraud the Patent Office. This Court does not see how either the prosecution histories or the Memo reveal a fraudulent scheme. Certainly it makes no sense to suggest that the prosecution histories themselves reveal such a scheme, as surely the PTO would have noticed and refused to grant the patents.

As for the Memo, Defendants point to two statements in it: 1) the statement that Dr.

Leber of the FDA stated that "a dose lower than 30mg may be appropriate for the more common, transient forms of insomnia" (Hedemann Decl. Ex. H at MI 085564); and 2) the statement that Dr. Lee of the FDA stated that, "in Great Britain, temazepam doses from 5-15mg are recommended for geriatrics" (Id. at MI 085565). The report of Dr. Leber's speculation about dosages below 30mg appears to be of no significance.[2] The report of Dr. Lee's statement has some significance, but it is evidence suggesting at most that the patents might be vulnerable to a validity challenge.[3] It is not, however, evidence that Sandoz engaged in a deliberately planned and carefully executed scheme to defraud the Patent Office, nor is it evidence that Plaintiffs knew that the patents had been procured through such a fraudulent scheme. Defendants have failed to point to even a scintilla of evidence that Plaintiffs knew at the time they initiated this suit that they were seeking to enforce patents which had been procured by knowing and willful fraud, within the meaning of Walker Process. There is simply no basis in the record to support this assertion. At most, the evidence supports the inference that Plaintiffs were aware that relevant prior art existed that could impact the validity or enforceability of the patents.

Moreover, the Federal Circuit has stated:

> *Walker Process* fraud is a variant of common law fraud, and that the elements of common law fraud include:(1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his

---

[2] Defendants appear to suggest that this shows that Dr. Leber is the true inventor of the 7.5mg dosage. That is quite a leap from the evidence.

[3] A reasonable finder of fact could infer from this evidence that Plaintiffs knew at the time they filed the infringement claims that the patents might have validity vulnerabilities, but not they knew that the patents had been procured by knowing and willful fraud.

reliance on the misrepresentation.

Unitherm Food Sys. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1358 (Fed. Cir. 2004) (citations omitted). Under this standard, the applicant's alleged omissions could conceivably meet the standard of "but for" causation. This is a far cry, however, from demonstrating that Plaintiffs knew that Sandoz had engaged in a deliberately planned and carefully executed scheme to defraud the Patent Office.

Plaintiffs have moved for summary judgment on the Fifth through Tenth counterclaims. The Fifth Count of the counterclaims, asserting inequitable conduct, is clearly not impacted by the Noerr-Pennington analysis, and, as to the Fifth Count of the counterclaims, the motion for partial summary judgment will be denied. As to the Sixth and Seventh Counts of the counterclaims, asserting violations of the Sherman Act, this Court finds that Noerr-Pennington immunity bars those claims, and, as to these claims, the motion for partial summary judgment will be granted. Plaintiffs cite Patel v. Soriano, 369 N.J. Super. 192, 233 (N.J. Super. Ct. App. Div. 2004), as authority for the proposition that New Jersey recognizes all defenses available under the federal antitrust statutes as defenses to analogous state law claims. Defendants have not contested this, and so, as to the Ninth and Tenth Counts of the counterclaims, this Court finds that Noerr-Pennington immunity bars those claims, and, as to these claims, the motion for partial summary judgment will be granted. As to the Eighth Count of the counterclaims, for common law unfair competition, although Patel distinguishes New Jersey's antitrust statutory law from the common law of unfair competition, Defendants have not argued that Noerr-Pennington immunity is inapplicable, and this Court understands Defendants to have conceded that Noerr-Pennington immunity may bar their unfair competition claim. Thus, as to the Eighth Count of the

counterclaims, this Court finds that Noerr-Pennington immunity bars that claim, and, as to that

claim, the motion for partial summary judgment will be granted.

As to the issues of the availability of the sham litigation exception and the Walker

Process fraud exception to Noerr-Pennington immunity in regard to the Fifth through Tenth

counterclaims, Plaintiffs' motion for partial summary judgment will be granted in part and

denied in part.  As to the Fifth Count, the motion will be denied; as to the remaining counts at

issue, the motion will be granted.

For these reasons,

**IT IS** on this 18th day of January, 2013

**ORDERED** that Plaintiffs' motion for partial summary judgment (Docket Entry No. 461)

is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that, as to the Fifth Count of the counterclaims in the Third Amended

Answer, the motion will be **DENIED**; and it is further

**ORDERED** that, as to the Sixth, Seventh, Eighth, Ninth and Tenth Counts of the

counterclaims in the Third Amended Answer, the motion will be **GRANTED**, and Judgment will

be entered in favor of Plaintiffs on those counts.


       s/ Stanley R. Chesler   
Stanley R. Chesler, U.S.D.J.

# United States Patent [19]

## Sterling

[11] **Patent Number:** **5,030,632**

[45] **Date of Patent:** **Jul. 9, 1991**

[54] **LOW DOSE TEMAZEPAM**

[75] Inventor: **William R. Sterling, Pine Brook, N.J.**

[73] Assignee: **Sandoz Pharm. Corp., E. Hanover, N.J.**

[21] Appl. No.: **569,787**

[22] Filed: **Aug. 17, 1990**

### Related U.S. Application Data

[63] Continuation of Ser. No. 434,142, Nov. 9, 1989, abandoned, which is a continuation of Ser. No. 295,332, Jan. 10, 1989, abandoned, which is a continuation of Ser. No. 910,571, Sep. 23, 1986, abandoned.

[51] Int. Cl.$^5$ .......................... A61K 9/14; A61K 9/48
[52] U.S. Cl. ................................. 514/221; 424/451;
            424/452; 424/489; 514/923; 514/962
[58] Field of Search ...................... 514/221, 923, 962;
            424/451, 452, 489

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,152,045 | 10/1964 | Vance et al. | 514/221 |
| 3,867,529 | 2/1975 | Ferrari et al. | 514/221 |
| 4,151,273 | 4/1979 | Riegelman et al. | 424/78 |
| 4,166,800 | 9/1979 | Fong | 424/497 |
| 4,232,016 | 11/1980 | Poetsch et al. | 514/221 |
| 4,261,987 | 4/1981 | Schlager | 514/221 |
| 4,316,897 | 2/1982 | Lotz | 514/221 |
| 4,384,975 | 5/1983 | Fong | 424/497 |
| 4,399,129 | 8/1983 | Gowers et al. | 514/221 |
| 4,479,911 | 10/1984 | Fong | 424/497 |
| 4,665,086 | 5/1987 | Short | 514/416 |
| 4,666,903 | 5/1987 | Gallager | 514/220 |
| 4,685,918 | 8/1987 | Amidon et al. | 424/467 |
| 4,721,709 | 1/1988 | Seth et al. | 514/221 |
| 4,780,316 | 10/1988 | Brox | 424/456 |
| 4,933,105 | 6/1990 | Fong | 424/497 |

| | | | |
|---|---|---|---|
| 4,940,588 | 7/1990 | Sparks et al. | 424/490 |
| 4,952,402 | 8/1990 | Sparks et al. | 424/419 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 953102 | 3/1964 | United Kingdom | 514/221 |
| 2067403A | 7/1981 | United Kingdom | 514/221 |
| 2142824A | 1/1985 | United Kingdom | 514/221 |

#### OTHER PUBLICATIONS

Br. J. Clin. Pharm. (1976), 3,543–550, Nicholson et al.
La Riforma Medica, 16:425–427, 1970, Senini et al.
Bombay, Hosp. J, 16:222–223, 1974, Sardesai et al.
Neuropsychobiology, 9(1):52–65, 1983, Matejcek et al.
Sarteschi et al., C.A. 77:772t (1972).
Bittencourt et al., C.A. 92:33698m (1980).
Hindmarch, C.A. 91:83557q (1979).
Fuccella, C.A. 92:47189h (1980).
Patrick et al., C.A. 108:68825b (1988).
Mattila et al., C.A. 103:166033h (1985).
Salonen et al., C.A. 104:136001z (1986).
Roth et al., C.A. 92:15829a (1980).
Fucella, C.A. 90:78856g (1979).
Laffont et al., C.A. 98:119578h (1983).
Borbely et al., C.A. 100:96533h (1984).
Okuma et al., C.A. 97:65862e (1982).

*Primary Examiner*—Shep K. Rose
*Attorney, Agent, or Firm*—Gerald D. Sharkin; Robert S. Honor; Thomas O. McGovern

[57] **ABSTRACT**

This invention relates to a hard gelatin capsule containing no more than 5 to 10 milligrams of crystalline temazepam and its use in the treatment of transient insomnia.

**3 Claims, No Drawings**

## LOW DOSE TEMAZEPAM

This is a continuation of application Ser. No. 07/434,142, filed Nov. 9, 1989, now abandoned which in turn is a continuation of application Ser. No. 07/295,332, filed Jan. 10, 1989, now abandoned, which in turn is a continuation of application Ser. No. 06/910,571, filed Sept. 23, 1986, now abandoned.

This invention relates to a new pharmaceutical form of temazepam and its use as a hypnotic agent.

More particularly, it relates to a low dose hard gelatin temazepam capsule and its use in the treatment of insomnia, especially, transient insomnia.

Temazepam, whose chemical name is 7-chloro-1,3-dihydro-3-hydroxy-1-methyl-5-phenyl-2H-1,4-benzodiazepin-2-one is a well known hypnotic agent used in the treatment of insomnia. The commercial product is sold in the United States in the form of hard gelatin capsules containing 15 and 30 milligrams of temazepam. Soft gelatin capsules containing 10 and 20 milligrams of temazepam are also available abroad. The hard gelatin capsule has been studied in great depth and has been found to be generally effective at doses of 15 and 30 milligrams of temazepam. At doses of 10 and 20 milligrams, the soft gelatin capsules have also been found to be effective, although Nicholson, et al. (Br. J. Clin. Pharmac., 3,543–550,1976) have reported that at 10 milligrams, no change in total sleep time was found, whereas at 20 milligrams, total sleep time was markedly increased. Lower dose forms of temazepam containing 5 milligrams of the compound have been used in a number of investigations (LaReforma Medica, 16,425–427, 1970; Bombay Hosp. J., 16,222–223,1974; Neuropsychobiology 9(1),52–65,1983) but have never been found to be useful in treating insomnia. In the Neuropsychobiology publication, the authors indicate that at 5 milligrams, temazepam is known to be of no clinical importance as a hypnotic agent.

Although the side effects of temazepam are minimal, the lowest effective dose of the product would be desirable. It would be especially useful in treating transient insomnia, which occurs in healthy individuals whose sleep pattern has been temporarily disrupted, for example by airplane travel or by changing work shifts. It has now been found that a hard gelatin capsule comprising up to 10 milligrams of temazepam, in which the temazepam particles have a specific surface area of from 0.65 to 1.1 square meters per gram (m²/g) and 95% of the particles have a particle size diameter of less than 65 microns (u), is effective in the treatment of insomnia, especially in improving sleep latency. Preferably the capsule contains the temazepam in amounts of from 5 to 10 milligrams, more preferably 6 to 8 milligrams, especially 7.5 milligrams, in combination with a pharmaceutically acceptable carrier. The capsule is normally administered just before bedtime.

Crystalline temazepam can be synthesized with a purity of not less than 98% using known procedures such as that disclosed in U.S. Pat. No. 3,296,245. The bulk temazepam is milled to obtain the required particle size and surface area with an Alpine 160 UPZ mill using a stainless steel pin. The particle size is determined using a Malverne Particle Sizer, Model 3600 E equipped with a 14.3 mm flow cell and a 100 mm lens. Surface area measurements are made essentially in accordance with the standard B.E.T. procedure of Brunauer, Emmet and Teller (J. Am. Chem. Soc. 59, 2682, 1937 and J. Am.

2

Chem. Soc., 60, 309, 1938). The temazepam is formulated with standard hard gelatin capsule excipients and encapsulated in conventional hard gelatin capsules using known procedures.

The use of low dose temazepam hard gelatin capsules in the treatment of transient insomnia was evaluated in a double blind, parallel group, placebo-controlled sleep laboratory study using 201 healthy subjects. Just before bedtime each subject was given a capsule containing placebo, or 7.5, 15 or 30 milligrams of temazepam. The number of subjects in the four treatment groups were placebo — 50; 7.5 milligrams — 51; 15 milligrams — 49; and 30 milligrams — 51. Testing was carried out over a period of one night in the sleep laboratory. The key parameters of sleep latency and total sleep time were among those measured by EEG analysis (polysomnography). The mean values for sleep latency and total sleep-time obtained with each treatment group were as follows:

| Group | Sleep Latency (min.) | Total Sleep Time (min.) |
|---|---|---|
| Placebo | 37 | 411 |
| 7.5 m.g. | 26 | 422 |
| 15 m.g. | 22 | 429 |
| 30 m.g. | 18 | 441 |

As can be seen from the above data 7.5 milligrams of temazepam was effective in reducing both sleep latency and increasing total sleep time in the study. The most unexpected result is that the effect occurred as the dosage dropped below the 15 milligram dosage level. The usual effect-no effect results, which would have been expected between 7.5 and 15 milligrams of temazepam based on previous hard gelatin capsule studies did not occur.

## EXAMPLE 1

White crystalline temazepam having a purity of not less than 98% is prepared according to the procedure described in U.S. Pat. No. 3,296,245. The bulk temazepam obtained is fed into an Alpine 160 UPZ mill with a stainless steel pin at a rate of about 40 kilograms (kg) per hour using a mill speed of about 11,000 RPM to obtain temazepam particles having a specific surface area of 0.65 to 1.1 m²/g area and 95% of the particles having a particle size diameter of less than 65 u. The surface area measurement is made with the Quantector Gas Flow System and Quantasorb Surface Area Analyser at the temperature of liquid nitrogen (−196° C.) using krypton as the absorbant and helium as the carrier gas. The particle size diameter is determined with the Malverne Particle Sizer at an obscuration value of 0.2 to 0.25 using a 0.1% Tween 80 solution in water saturated with temazepam in which 1 to 2 grams of temazepam sample to be tested has been dispersed. After the feed rate and mill speed of the Alpine mill have been set, they are monitored at regular intervals to maintain the required particle size and surface area.

## EXAMPLE 2

To prepare hard gelatin capsules containing 7.5 milligrams of the temazepam of example 1, 12 kg of temazepam and 12 kg. of lactose are passed through an 18 mesh screen. This mixture is added to 372 kg of lactose, which has also been passed through an 18 mesh screen, and 4 kg of magnesium stearate in a 30 cu. ft. PK Mixer without an intensity bar. The capsule ingredients are

3

4

mixed for 30 minutes using tumbling action only. The capsule mix is encapsulated in number 3 Lock hard gelatin capsules with opaque blue caps and opaque pink bodies, and the capsules are then passed through a capsule polisher. Each capsule contains 250 milligrams of capsule mix and 7.5 milligrams of temazepam.

I claim:

1. A method of treating transient insomnia with temazepam in a human in need of said treatment the improvement which consisting essentially of the step of

administering to said human a hard gelatin capsule containing not more than 5 to 10 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1 m²/g and 95% of the temazepam having particle size diameters of less than 65 microns.

2. A method according to claim 1, in which 6 to 8 milligrams of temazepam are administered.

3. A method according to claim 1 in which 7.5 milligrams of temazepam are administered.

* * * * *

US005211954A

# United States Patent [19]

## Sterling

[11] **Patent Number:** 5,211,954

[45] **Date of Patent:** May 18, 1993

[54] **LOW DOSE TEMAZEPAM**

[75] Inventor: William R. Sterling, Pine Brook, N.J.

[73] Assignee: Sandoz Ltd., Basel, Switzerland

[21] Appl. No.: 876,269

[22] Filed: Apr. 30, 1992

### Related U.S. Application Data

[60] Continuation of Ser. No. 709,866, Jun. 3, 1991, abandoned, which is a division of Ser. No. 569,787, Aug. 17, 1990, Pat. No. 5,030,632, which is a continuation of Ser. No. 434,142, Nov. 9, 1989, abandoned, which is a continuation of Ser. No. 295,332, Jan. 10, 1989, abandoned, which is a continuation of Ser. No. 910,571, Sep. 23, 1986, abandoned.

[51] Int. Cl.⁵ ............................ A61K 9/14; A61K 9/48
[52] U.S. Cl. ..................................... 424/452; 424/453; 424/489; 514/221; 514/923; 514/962
[58] Field of Search ....................... 514/221, 923, 962; 424/451, 452, 489

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,152,045 | 10/1964 | Vance et al. ............................ | 514/221 |
| 3,867,529 | 2/1975 | Ferrari et al. ........................... | 514/221 |
| 4,151,273 | 4/1979 | Riegelman et al. ..................... | 424/78 |
| 4,166,800 | 9/1979 | Fong ....................................... | 424/497 |
| 4,232,016 | 11/1980 | Poetsch et al. ......................... | 514/221 |
| 4,261,987 | 4/1981 | Schlager ................................. | 514/221 |
| 4,316,897 | 2/1982 | Lotz ........................................ | 514/221 |
| 4,384,975 | 5/1983 | Fong ....................................... | 424/497 |
| 4,399,129 | 8/1983 | Gowers et al. ......................... | 514/221 |
| 4,479,911 | 10/1984 | Fong ....................................... | 424/497 |
| 4,665,086 | 5/1987 | Short ...................................... | 514/416 |
| 4,666,903 | 5/1987 | Gallager ................................. | 514/220 |
| 4,685,918 | 8/1987 | Amidon et al. ......................... | 424/467 |
| 4,721,709 | 1/1988 | Seth et al. .............................. | 514/221 |
| 4,780,316 | 10/1988 | Brox ....................................... | 424/456 |

| | | | |
|---|---|---|---|
| 4,933,105 | 6/1990 | Fong ....................................... | 424/497 |
| 4,940,588 | 7/1990 | Sparks et al. .......................... | 424/490 |
| 4,952,402 | 8/1990 | Sparks et al. .......................... | 424/419 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 953102 | 3/1964 | United Kingdom ................ | 514/221 |
| 2067403A | 7/1981 | United Kingdom ................ | 514/221 |
| 2142824A | 1/1985 | United Kingdom ................ | 514/221 |

#### OTHER PUBLICATIONS

Br. J. Clin. Pharm. (1976), 3,543–550, Nicholson et al.
La Riforma Medica, 16:425–427, 1970, Senini et al.
Bombay, Hosp. J, 16:222–223, 1974, Sardesai et al.
Neuropsychobiology, 9(1):52–65, 1983, Matejcek, et al.
Sarteschi et al. C.A. 77:772t (1972).
Bittencourt et al C.A. 92:33698m (1980).
Hindmarch C.A. 91:83557q (1979).
Fuccella C.A. 92:47189h (1980).
Patrick et al. C.A. 108:68825b (1988).
Mattila et al. C.A. 103:166033h (1985).
Salonen et al, C.A. 104:1360012 (1986).
Roth et al. C.A. 92:15829a (1980).
Fucella et al. C.A. 90:78856g (1979).
Laffont et al. C.A. 98:119578h (1983).
Borbely et al. C.A. 100:96533h (1984).
Okuma et al. C.A. 97:65862e (1982).

*Primary Examiner*—Shep K. Rose
*Attorney, Agent, or Firm*—Robert S. Honor; Melvyn M. Kassenoff; Thomas O. McGovern

[57] **ABSTRACT**

This invention relates to a hard gelatin capsule containing no more than 5 to 10 milligrams of crystalline temazepam and its use in the treatment of transient insomnia.

**2 Claims; No Drawings**

**A3986**

## LOW DOSE TEMAZEPAM

This is a continuation of application Ser. No. 07/709,866, filed June 3, 1991, now abandoned which in turn is a division of application Ser. No. 07/569,787, filed Aug. 17, 1990, now U.S. Pat. No. 5,030,632, which in turn is a continuation of application Ser. No. 07/434,142, filed Nov. 9, 1989 which in turn is a continuation of application Ser. No. 07/295,332, filed Jan. 10, 1989, which in turn is a continuation of application Ser. No. 06/910,571, filed Sep. 23, 1986, the latter three of which are now abandoned.

This invention relates to a new pharmaceutical form of temazepam and its use as a hypnotic agent.

More particularly, it relates to a low dose hard gelatin temazepam capsule and its use in the treatment of insomnia, especially, transient insomnia.

Temazepam, whose chemical name is 7-chloro-1,3-dihydro-3-hydroxy-1-methyl-5-phenyl-2H-1,4-benzodiazepin-2-one, is a well known hypnotic agent used in the treatment of insomnia. The commercial product is sold in the United States in the form of hard gelatin capsules containing 15 and 30 milligrams of temazepam. Soft gelatin capsules containing 10 and 20 milligrams of temazepam are also available abroad. The hard gelatin capsule has been studied in great depth and has been found to be generally effective at doses of 15 and 30 milligrams of temazepam. At doses of 10 and 20 milligrams, the soft gelatin capsules have also been found to be effective, although Nicholson, et al. (Br. J. Clin. Pharmac., 3,543-550,1976) have reported that at 10 milligrams, no change in total sleep time was found, whereas at 20 milligrams, total sleep time was markedly increased. Lower dose forms of temazepam containing 5 milligrams of the compound have been used in a number of investigations (LaReforma a Medica, 16,425-427, 1970; Bombay Hosp. J., 16,222-223,1974; Neuropsychobiology 9(1),52-65,1983) but have never been found to be useful in treating insomnia. In the Neuropsychobiology publication, the authors indicate that at 5 milligrams, temazepam is known to be of no clinical importance as a hypnotic agent.

Although the side effects of temazepam are minimal, the lowest effective dose of the product would be desirable. It would be especially useful in treating transient insomnia, which occurs in healthy individuals whose sleep pattern has been temporarily disrupted, for example by airplane travel or by changing work shifts. It has now been found that a hard gelatin capsule comprising up to 10 milligrams of temazepam, in which the temazepam particles have a specific surface area of from 0.65 to 1.1 square meters per gram ($m^2/g$) and 95% of the particles have a particle size diameter of less than 65 microns ($\mu$), is effective in the treatment of insomnia, especially in improving sleep latency. Preferably the capsule contains the temazepam in amounts of from 5 to 10 milligrams, more preferably 6 to 8 milligrams, especially 7.5 milligrams, in combination with a pharmaceutically acceptable carrier. The capsule is normally administered just before bedtime.

Crystalline temazepam can be synthesized with a purity of not less than 98% using known procedures such as that disclosed in U.S. Pat. No. 3,296,245. The bulk temazepam is milled to obtain the required particle size and surface area with an Alpine 160 UPZ mill using a stainless steel pin. The particle size is determined using a Malverne Particle Sizer, Model 3600 E equipped with

a 14.3 mm flow cell and a 100 mm lens. Surface area measurements are made essentially in accordance with the standard B.E.T. procedure of Brunauer, Emmet and Teller (J. Am. Chem. Soc. 59, 2682, 1937 and J. Am. Chem. Soc., 60, 309, 1938). The temazepam is formulated with standard hard gelatin capsule excipients and encapsulated in conventional hard gelatin capsules using known procedures.

The use of low dose temazepam hard gelatin capsules in the treatment of transient insomnia was evaluated in a double blind, parallel group, placebo-controlled sleep laboratory study using 201 healthy subjects. Just before bedtime each subject was given a capsule containing placebo, or 7.5, 15 or 30 milligrams of temazepam. The number of subjects in the four treatment groups were placebo—50; 7.5 milligrams—51; 15 milligrams—49; and 30 milligrams—51. Testing was carried out over a period of one night in the sleep laboratory. The key parameters of sleep latency and total sleep time were among those measured by EEG analysis (polysomnography). The mean values for sleep latency and total sleeptime obtained with each treatment group were as follows:

| Group | Sleep Latency (min.) | Total Sleep Time (min.) |
|---|---|---|
| Placebo | 37 | 411 |
| 7.5 m.g. | 26 | 422 |
| 15 m.g. | 22 | 429 |
| 30 m.g. | 18 | 441 |

As can be seen from the above data 7.5 milligrams of temazepam was effective in reducing both sleep latency and increasing total sleep time in the study. The most unexpected result is that the effect occurred as the dosage dropped below the 15 milligram dosage level. The usual effect-no effect results, which would have been expected between 7.5 and 15 milligrams of temazepam based on previous hard gelatin capsule studies did not occur.

### EXAMPLE 1

White crystalline temazepam having a purity of not less than 98% is prepared according to the procedure described in U.S. Pat. No. 3,296,245. The bulk temazepam obtained is fed into an Alpine 160 UPZ mill with a stainless steel pin at a rate of about 40 kilograms (kg) per hour using a mill speed of about 11,000 RPM to obtain temazepam particles having a specific surface area of 0.65 to 1.1 $m^2/g$ area and 95% of the particles having a particle size diameter of less than 65 $\mu$. The surface area measurement is made with the Quantector Gas Flow System and Quantasorb Surface Area Analyser at the temperature of liquid nitrogen (−196° C.) using krypton as the absorbent and helium as the carrier gas. The particle size diameter is determined with the Malverne Particle Sizer at an obscuration value of 0.2 to 0.25 using a 0.1% Tween 80 solution in water saturated with temazepam in which 1 to 2 grams of temazepam sample to be tested has been dispersed. After the feed rate and mill speed of the Alpine mill have been set, they are monitored at regular intervals to maintain the required particle size and surface area.

### EXAMPLE 2

To prepare hard gelatin capsules containing 7.5 milligrams of the temazepam of example 1, 12 kg of temazepam and 12 kg. of lactose are passed through an 18 mesh

5,211,954

**3**

screen. This mixture is added to 372 kg of lactose, which has also been passed through an 18 mesh screen, and 4 kg of magnesium stearate in a 30 cu. ft. PK Mixer without an intensity bar. The capsule ingredients are mixed for 30 minutes using tumbling action only. The capsule mix is encapsulated in number 3 Lock hard gelatin capsules with opaque blue caps and opaque pink bodies, and the capsules are then passed through a capsule polisher. Each capsule contains 250 milligrams of capsule mix and 7.5 milligrams of temazepam.

I claim:

**4**

1. A hard gelatin capsule containing a temazepam formulation consisting essentially of 6 to 8 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1 m²/g and 95% of the temazepam having a particle size of less than 65 microns in admixture with a pharmaceutically acceptable carrier therefor.

2. A hard gelatin capsule containing a temazepam formulation consisting essentially of 7.5 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1 m²/g and 95% of the temazepam having a particle size of less than 65 microns in admixture with a pharmaceutically acceptable carrier therefor.

* * * * *

# United States Patent [19]

## Sterling

| | |
|---|---|
| [11] | Patent Number: **5,326,758** |
| [45] | Date of Patent: * **Jul. 5, 1994** |

[54] **LOW DOSE TEMAZEPAM**

[75] Inventor: William R. Sterling, Pine Brook, N.J.

[73] Assignee: Sandoz Pharm. Corp., E. Hanover, N.J.

[*] Notice: The portion of the term of this patent subsequent to Jul. 9, 2008 has been disclaimed.

[21] Appl. No.: **32,216**

[22] Filed: **Mar. 17, 1993**

### Related U.S. Application Data

[60] Division of Ser. No. 876,269, Apr. 30, 1992, Pat. No. 5,211,954, which is a continuation of Ser. No. 709,866, Jun. 3, 1991, abandoned, which is a division of Ser. No. 569,787, Aug. 17, 1990, Pat. No. 5,030,632, which is a continuation of Ser. No. 434,142, Nov. 9, 1989, abandoned, which is a continuation of Ser. No. 295,332, Jan. 10, 1989, abandoned, which is a continuation of Ser. No. 910,571, Sep. 23, 1986, abandoned.

[51] Int. Cl.⁵ ........................ A61K 31/55; A61K 9/48; A61K 9/14

[52] U.S. Cl. ..................................... 514/221; 424/451

[58] Field of Search .......................................... 514/221

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,152,045 | 10/1964 | Vance et al. ....................... 514/221 |
| 3,867,529 | 2/1975 | Ferrar et al. ...................... 514/221 |
| 4,151,273 | 4/1979 | Riegelman et al. ................ 514/468 |
| 4,166,800 | 9/1979 | Fong, III ........................... 424/497 |
| 4,232,016 | 11/1980 | Poetsch et al. .................... 514/221 |
| 4,261,987 | 4/1981 | Schlager ............................ 514/221 |
| 4,316,897 | 2/1982 | Lotzi ................................. 514/221 |
| 4,384,975 | 5/1983 | Fong, II ............................ 424/497 |
| 4,399,129 | 8/1983 | Gowers et al. .................... 514/221 |
| 4,479,911 | 10/1984 | Fong, I ............................. 424/497 |

| | | |
|---|---|---|
| 4,666,903 | 5/1987 | Gallager ........................... 514/220 |
| 4,721,709 | 1/1988 | Seth et al. ......................... 514/221 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 953102 | 3/1964 | United Kingdom | ................ 514/221 |
| 2067403A | 7/1981 | United Kingdom | ................ 514/221 |
| 2142824A | 1/1985 | United Kingdom | ................ 514/221 |

#### OTHER PUBLICATIONS

Fowler J. Int. Med. Res. 8(4):295–299 (1980) Post-Marketing Surveillance of Euhypnos (Temazepam).

Matejcek Neuropsychobiology 9(1):52–65 (1983).

Smith Anaesthesia 40(4):368–371 Apr. 1985.

Klem et al Eur. J. Clin. Pharmacol. 30(6):745–747 Sep. 1986.

Sarteschi et al C.A. 77:772t(1972); Bittencourt et al C.A. 92: 33698m(1980).

Hindmarch C.A. 91: 83557q(1979); Fuccella C.A. 92: 471819h(1980).

Patrick et al C.A. 108: 68825B(1988); Mattila et al C.A. 103: 166033H(1985).

Salonen et al C.A. 104: 1360012(1986); Roth et al C.A. 92: 15829a(1980).

Fucella C.A. 90: 78856g(1979); Laffont et al C.A. 98: 119578h(1983).

Borbely et al C.A. 100: 96533h(1984); Okuma et al C.A. 97: 65862c(1982).

*Primary Examiner*—Shep K. Rose
*Attorney, Agent, or Firm*—Robert S. Honor; Melvyn M. Kassenoff; Thomas O. McGovern

[57] **ABSTRACT**

This invention relates to a hard gelatin capsule containing no more than $5$ to $10^5$ milligrams of crystalline temazepam and its use in the treatment of transient insomnia.

**3 Claims, No Drawings**

1

5,326,758

2

## LOW DOSE TEMAZEPAM

This is a division of application Ser. No. 07/876,269, filed Apr. 30, 1992 now U.S. Pat. No. 5,211,954, which 5 in turn is a continuation of application Ser. No. 07/709,866, filed Jun. 3, 1991, now abandoned, which in turn is a division of application Ser. No. 07/569,787, filed Aug. 17, 1990, now U.S. Pat. No. 5,030,632, which in turn is a continuation of application Ser. No. 10 07/434,142, filed Nov. 9, 1989, which in turn is a continuation of application Ser. No. 07/295,332, filed Jan. 10, 1989, which in turn is a continuation of application Ser. No. 06/910,571, filed Sep. 23, 1986, the latter three of which are now abandoned.

This invention relates to a new pharmaceutical form of temazepam and its use as a hypnotic agent.

More particularly, it relates to a low dose hard gelatin temazepam capsule and its use in the treatment of insomnia, especially, transient insomnia. 20

Temazepam, whose chemical name is 7-chloro-1,3-dihydro-3-hydroxy-1-methyl-5-phenyl-2H-1,4-benzodiazepin-2-one, is a well known hypnotic agent used in the treatment of insomnia. The commercial product is sold in the United States in the form of hard gelatin 25 capsules containing 15 and 30 milligrams of temazepam. Soft gelatin capsules containing 10 and 20 milligrams of temazepam are also available abroad. The hard gelatin capsule has been studied in great depth and has been found to be generally effective at doses of 15 and 30 30 milligrams of temazepam. At doses of 10 and 20 milligrams, the soft gelatin capsules have also been found to be effective, although Nicholson, et al. (Br. J. Clin. Pharmac., 3,543-550,1976) have reported that at 10 milligrams, no change in total sleep time was found, 35 whereas at 20 milligrams, total sleep time was markedly increased. Lower dose forms of temazepam containing 5 milligrams of the compound have been used in a number of investigations (LaReforma Medica, 16,425-427, 1970; Bombay Hosp. J., 16,222-223,1974; Neuropsy- 40 chobiology 9(1),52-65,1983) but have never been found to be useful in treating insomnia. In the Neuropsychobiology publication, the authors indicate that at 5 milligrams, temazepam is known to be of no clinical importance as a hypnotic agent. 45

Although the side effects of temazepam are minimal, the lowest effective dose of the product would be desirable. It would be especially useful in treating transient insomnia, which occurs in healthy individuals whose sleep pattern has been temporarily disrupted, for exam- 50 ple by airplane travel or by changing work shifts. It has now been found that a hard gelatin capsule comprising up to 10 milligrams of temazepam, in which the temazepam particles have a specific surface area of from 0.65 to 1.1 square meters per gram (m²/g) and 95% of the 55 particles have a particle size diameter of less than 65 microns (u), is effective in the treatment of insomnia, especially in improving sleep latency. Preferably the capsule contains the temazepam in amounts of from 5 to 10 milligrams, more preferably 6 to 8 milligrams, espe- 60 cially 7.5 milligrams, in combination with a pharmaceutically acceptable carrier. The capsule is normally administered just before bedtime.

Crystalline temazepam can be synthesized with a purity of not less than 98% using known procedures 65 such as that disclosed in U.S. Pat. No. 3,296,245. The bulk temazepam is milled to obtain the required particle size and surface area with an Alpine 160 UPZ mill using

a stainless steel pin. The particle size is determined using a Malverne Particle Sizer, Model 3600 E equipped with a 14.3 mm flow cell and a 100 mm lens. Surface area measurements are made essentially in accordance with the standard B.E.T. procedure of Brunauer, Emmet and Teller (J. Am. Chem. Soc. 59, 2682, 1937 and J. Am. Chem. Soc., 60, 309, 1938). The temazepam is formulated with standard hard gelatin capsule excipients and encapsulated in conventional hard gelatin capsules using known procedures.

The use of low dose temazepam hard gelatin capsules in the treatment of transient insomnia was evaluated in a double blind, parallel group, placebo-controlled sleep laboratory study using 201 healthy subjects. Just before bedtime each subject was given a capsule containing placebo, or 7.5, 15 or 30 milligrams of temazepam. The number of subjects in the four treatment groups were placebo—50; 7.5 milligrams - 51; 15 milligrams - 49; and 30 milligrams—51. Testing was carried out over a period of one night in the sleep laboratory. The key parameters of sleep latency and total sleep time were among those measured by EEG analysis (polysomnography). The mean values for sleep latency and total sleeptime obtained with each treatment group were as follows:

| Group | Sleep Latency (min.) | Total Sleep Time (min.) |
|-------|----------------------|-------------------------|
| Placebo | 37 | 411 |
| 7.5 m.g. | 26 | 422 |
| 15 m.g. | 22 | 429 |
| 30 m.g. | 18 | 441 |

As can be seen from the above data 7.5 milligrams of temazepam was effective in reducing both sleep latency and increasing total sleep time in the study. The most unexpected result is that the effect occurred as the dosage dropped below the 15 milligram dosage level. The usual effect-no effect results, which would have been expected between 7.5 and 15 milligrams of temazepam based on previous hard gelatin capsule studies did not occur.

## EXAMPLE 1

White crystalline temazepam having a purity of not less than 98% is prepared according to the procedure described in U.S. Pat. No. 3,296,245. The bulk temazepam is fed into an Alpine 160 UPZ mill with a stainless steel pin at a rate of about 40 kilograms (kg) per hour using a mill speed of about 11,000 RPM to obtain temazepam particles having a specific surface area of 0.65 to 1.1 m²/g area and 95% of the particles having a particle size diameter of less than 65 u. The surface area measurement is made with the Quantector Gas Flow System and Quantasorb Surface Area Analyser at the temperature of liquid nitrogen (−196° C.) using krypton as the absorbant and helium as the carrier gas. The particle size diameter is determined with the Malverne Particle Sizer at an obscuration value of 0.2 to 0.25 using a 0.1% Tween 80 solution in water saturated with temazepam in which 1 to 2 grams of temazepam sample to be tested has been dispersed. After the feed rate and mill speed of the Alpine mill have been set, they are monitored at regular intervals to maintain the required particle size and surface area.

## EXAMPLE 2

To prepare hard gelatin capsules containing 7.5 milligrams of the temazepam of example 1, 12 kg of temaze-

3

pam and 12 kg. of lactose are passed through an 18 mesh screen. This mixture is added to 372 kg of lactose, which has also been passed through an 18 mesh screen, and 4 kg of magnesium stearate in a 30 cu. ft. PK Mixer without an intensity bar. The capsule ingredients are mixed for 30 minutes using tumbling action only. The capsule mix is encapsulated in number 3 Lock hard gelatin capsules with opaque blue caps and opaque pink bodies, and the capsules are then passed through a capsule polisher. Each capsule contains 250 milligrams of capsule mix and 7.5 milligrams of temazepam.

I claim:

1. A method of treating transient insomnia in a human in need of said treatment which comprises administering orally to said human a temazepam formulation consisting essentially of 5 to 10 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1

4

$m^2/g$ and 95% of the temazepam having a particle size of less than 65 microns.

2. A method of treating transient insomnia in a human in need of said treatment which comprises administering orally to said human a temazepam formulation consisting essentially of 6 to 8 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1 $m^2/g$ and 95% of the temazepam having a particle size of less than 65 microns.

3. A method of treating transient insomnia in a human in need of said treatment which comprises administering orally to said human a temazepam formulation consisting essentially of 7.5 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1 $m^2/g$ and 95% of the temazepam having a particle size of less than 65 microns.

* * * * *

# United States Patent [19]

## Sterling

[11]  **Patent Number:**    **5,629,310**

[45]  **Date of Patent:**    *May 13, 1997

[54]  **LOW DOSE TEMAZEPAM**

[76]  Inventor:    **William R. Sterling**, 138 Konner Ave., Pine Brook, N.J. 07058

[*]  Notice:    The portion of the term of this patent subsequent to Jul. 9, 2008, has been disclaimed.

[21]  Appl. No.: **424,135**

[22]  Filed:    **Apr. 17, 1995**

### Related U.S. Application Data

[60]  Continuation of Ser. No. 260,584, Jun. 16, 1994, abandoned, which is a division of Ser. No. 32,216, Mar. 17, 1993, Pat. No. 5,326,758, which is a division of Ser. No. 876,269, Apr. 30, 1992, Pat. No. 5,211,954, which is a continuation of Ser. No. 709,866, Jun. 3, 1991, abandoned, which is a division of Ser. No. 569,787, Aug. 17, 1990, Pat. No. 5,030,632, which is a continuation of Ser. No. 434,142, Nov. 9, 1989, abandoned, which is a continuation of Ser. No. 295,332, Jan. 10, 1989, abandoned, which is a continuation of Ser. No. 910,571, Sep. 23, 1986, abandoned.

[51]  Int. Cl.$^6$ ............................ A61K 31/55; A61K 9/48; A61K 9/14

[52]  U.S. Cl. ................................ 514/221; 424/451

[58]  Field of Search ................................ 514/221

[56]  **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,152,045 | 10/1964 | Vance et al. | 514/221 |
| 3,867,529 | 2/1975 | Ferrari et al. | 514/221 |
| 4,151,273 | 4/1979 | Riegelman et al. | 424/15 |
| 4,166,800 | 9/1979 | Fong | 424/497 |
| 4,232,016 | 11/1980 | Poetsch et al. | 514/221 |
| 4,261,987 | 4/1981 | Schlager | 514/221 |
| 4,316,897 | 2/1982 | Lotz | 514/221 |
| 4,384,975 | 5/1983 | Fong | 424/497 |
| 4,399,129 | 8/1983 | Gowers et al. | 514/221 |
| 4,479,911 | 10/1984 | Fong | 424/497 |
| 4,665,086 | 5/1987 | Short | 514/416 |
| 4,666,903 | 5/1987 | Gallager | 514/220 |
| 4,685,918 | 8/1987 | Amidon et al. | 424/467 |
| 4,721,709 | 1/1988 | Seth et al. | 514/221 |
| 4,780,316 | 10/1988 | Brox | 424/456 |

| | | | |
|---|---|---|---|
| 4,933,105 | 6/1990 | Fong | 424/497 |
| 4,940,588 | 7/1990 | Sparks et al. | 424/490 |
| 4,952,402 | 8/1990 | Sparks et al. | 424/419 |
| 5,030,632 | 7/1991 | Sterling | 514/221 |
| 5,211,954 | 5/1993 | Sterling | 424/452 |
| 5,326,758 | 7/1994 | Sterling | 514/221 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 953102 | 3/1964 | United Kingdom | 514/221 |
| 2067403 | 7/1981 | United Kingdom | 514/221 |
| 2142824 | 1/1985 | United Kingdom | 514/221 |

#### OTHER PUBLICATIONS

Br. J. Clin. Pharm. (1976), 3,543–550, Nicholson et al.
La Riforma Medica, 16:425–427, 1970, Senini et al.
Bombay, Hosp. J, 16:222–223, 1974, Sardesai et al.
Neuropsychobiology, 9(1):52–65, 1983, Matejcek, et al.
Sarteschi et al CA. 77: 772T(1972); Bittencourt et al C.A. 92: 33698M (1980).
Hindmarch C.A. 91: 83557Q(1979); Fuccella C.A. 92: 47189H (1980).
Patrick et al C.A. 108: 68825B(1988); Mattila et al C.A. 103: 166033h (1985).
Salonen et al C.A. 104: 1360012(1986); Roth et al C.A. 92: 15829a (1980).
Fuccella C.A. 90: 78856g(1979); Laffont et al C.A. 98: 119578h(1983).
Borbely et al C.A. 100: 96533h(1984); Okuma et al C.A. 97: 65862e (1982).
Fowler J. Int. Med. Res. 8(4): 295–299 (1980) Post–Marketing Surveilance of Euhypnos (Temazepam).
Matejcek Neuropsychoblology 9(1): 52–65 (1983).
Smith Anaesthesia 40(4):368–371 Apr. 1985.
Klem et al Eur. J. Clin. Pharmacol. 30(6):745–747 Sep. 1986.

*Primary Examiner*—Shep K. Rose
*Attorney, Agent, or Firm*—Robert S. Honor; Melvyn M. Kassenoff; Thomas O. McGovern

[57]  **ABSTRACT**

This invention relates to a hard gelatin capsule containing no more than 5 to 10 milligrams of crystalline temazepam and its use in the treatment of transient insomnia.

**2 Claims, No Drawings**

5,629,310

## 1
## LOW DOSE TEMAZEPAM

This is a continuation of application Ser. No. 08/260,584, filed Jun. 16, 1994, now abandoned which in turn is a division of application Ser. No. 08/032,216, filed Mar. 17, 1993, now U.S. Pat. No. 5,326,758, which in turn is a division of application Ser. No. 07/876,269, filed Apr. 30, 1992, now U.S. Pat. No. 5,211,954, which in turn is a continuation of application Ser. No. 07/709,866, filed Jun. 3, 1991, now abandoned, which in turn is a division of application Serial No. 07/569,787, filed Aug. 17, 1990, now U.S. Pat. No. 5,030,632, which in turn is a continuation of application Serial No. 07/434,142, filed Nov. 9, 1989, which in turn is a continuation of application Ser. No. 07/295,332, filed Jan. 10, 1989, which in turn is a continuation of application Ser. No. 06/910,571, filed Sep. 23, 1986, the latter three of which are now abandoned.

This invention relates to a new pharmaceutical form of temazepam and its use as a hypnotic agent.

More particularly, it relates to a low dose hard gelatin temazepam capsule and its use in the treatment of insomnia, especially, transient insomnia.

Temazepam, whose chemical name is 7-chloro-1,3-dihydro-3-hydroxy-1-methyl-5-phenyl-2H-1,4-benzodiazepin-2-one, is a well known hypnotic agent used in the treatment of insomnia. The commercial product is sold in the United States in the form of hard gelatin capsules containing 15 and 30 milligrams of temazepam. Soft gelatin capsules containing 10 and 20 milligrams of temazepam are also available abroad. The hard gelatin capsule has been studied in great depth and has been found to be generally effective at doses of 15 and 30 milligrams of temazepam. At doses of 10 and 20 milligrams, the soft gelatin capsules have also been found to be effective, although Nicholson, et al. (Br. J. Clin. Pharmac., 3, 543–550, 1976) have reported that at 10 milligrams, no change in total sleep time was found, whereas at 20 milligrams, total sleep time was markedly increased. Lower dose forms of temazepam containing 5 milligrams of the compound have been used in a number of investigations (LaReforma Medica, 16, 425–427, 1970; Bombay Hosp. J., 16, 222–223, 1974; Neuropsychobiology q(1), 52–65, 1983) but have never been found to be useful in treating insomnia. In the Neuropsychobiology publication, the authors indicate that at 5 milligrams, temazepam is known to be of no clinical importance as a hypnotic agent.

Although the side effects of temazepam are minimal, the lowest effective dose of the product would be desirable. It would be especially useful in treating transient insomnia, which occurs in healthy individuals whose sleep pattern has been temporarily disrupted, for example by airplane travel or by changing work shifts. The present invention provides a method of treating insomnia which comprises administering to a human in need of said treatment up to 10 milligrams, in particular, 5 to 10 milligrams, preferably, 6 to 8 milligrams, more preferably, 7.5 milligrams of temazepam having a surface area of from 0.65 to 1.1 m²/g and 95% of the temazepam having particle size diameters of less than 65 microns. It has now been found that a hard gelatin capsule comprising up to 10 milligrams of temazepam, in which the temazepam particles have a specific surface area of from 0.65 to 1.1 square meters per gram (m²/g) and 95% of the particles have a particle size diameter of less than 65 microns (u), is effective in the treatment of insomnia, especially in improving sleep latency. Preferably the capsule contains the temazepam in amounts of from 5 to 10 milligrams, more preferably 6 to 8 milligrams, especially 7.5

## 2

milligrams, in combination with a pharmaceutically acceptable carrier. The capsule is normally administered just before bedtime.

Crystalline temazepam can be synthesized with a purity of not less than 98% using known procedures such as that disclosed in U.S. Pat. No. 3,296,245. The bulk temazepam is milled to obtain the required particle size and surface area with an Alpine 160 UPZ mill using a stainless steel pin. The particle size is determined using a Malverne Particle Sizer, Model 3600 E equipped with a 14.3 mm flow cell and a 100 mm lens. Surface area measurements are made essentially in accordance with the standard B.E.T. procedure of Brunauer, Emmet and Teller (J. Am. Chem. Soc. 59, 2682, 1937 and J. Am. Chem. Soc., 60, 309, 1938). The temazepam is formulated with standard hard gelatin capsule excipients and encapsulated in conventional hard gelatin capsules using known procedures.

The use of low dose temazepam hard gelatin capsules in the treatment of transient insomnia was evaluated in a double blind, parallel group, placebo-controlled sleep laboratory study using 201 healthy subjects. Just before bedtime each subject was given a capsule containing placebo, or 7.5, 15 or 30 milligrams of temazepam. The number of subjects in the four treatment groups were placebo—50; 7.5 milligrams—51; 15 milligrams—49; and 30 milligrams—51. Testing was carried out over a period of one night in the sleep laboratory. The key parameters of sleep latency and total sleep time were among those measured by EEG analysis (polysomnography). The mean values for sleep latency and total sleeptime obtained with each treatment group were as follows:

| Group | Sleep Latency (min.) | Total Sleep Time (min.) |
|---|---|---|
| Placebo | 37 | 411 |
| 7.5 m.g. | 26 | 422 |
| 15 m.g. | 22 | 429 |
| 30 m.g. | 18 | 441 |

As can be seen from the above data 7.5 milligrams of temazepam was effective in reducing both sleep latency and increasing total sleep time in the study. The most unexpected result is that the effect occurred as the dosage dropped below the 15 milligram dosage level. The usual effect-no effect results, which would have been expected between 7.5 and 15 milligrams of temazepam based on previous hard gelatin capsule studies did not occur.

### EXAMPLE 1

White crystalline temazepam having a purity of not less than 98% is prepared according to the procedure described in U.S. Pat. No. 3,296,245. The bulk temazepam obtained is fed into an Alpine 160 UPZ mill with a stainless steel pin at a rate of about 40 kilograms (kg) per hour using a mill speed of about 11,000 RPM to obtain temazepam particles having a specific surface area of 0.65 to 1.1 m²/g area and 95% of the particles having a particle size diameter of less than 65 u. The surface area measurement is made with the Quantector Gas Flow System and Quantasorb Surface Area Analyser at the temperature of liquid nitrogen (–196° C.) using krypton as the absorbant and helium as the carrier gas. The particle size diameter is determined with the Malverne Particle Sizer at an obscuration value of 0.2 to 0.25 using a 0.1% Tween 80 solution in water saturated with temazepam in which 1 to 2 grams of temazepam sample to be tested has been dispersed. After the feed rate and mill speed of the Alpine mill have been set, they are monitored at regular intervals to maintain the required particle size and surface area.

5,629,310

## 3

### EXAMPLE 2

To prepare hard gelatin capsules containing 7.5 milligrams of the temazepam of example 1, 12 kg of temazepam and 12 kg. of lactose are passed through an 18 mesh screen. This mixture is added to 372 kg of lactose, which has also been passed through an 18 mesh screen, and 4 kg of magnesium stearate in a 30 cu. ft. PK Mixer without an intensity bar. The capsule ingredients are mixed for 30 minutes using tumbling action only. The capsule mix is encapsulated in number 3 Lock hard gelatin capsules with opaque blue caps and opaque pink bodies, and the capsules are then passed through a capsule polisher. Each capsule contains 250 milligrams of capsule mix and 7.5 milligrams of temazepam.

## 4

I claim:

1. A method of treating insomnia in a human in need of said treatment which comprises administering orally to said human a temazepam formulation consisting essentially of 6 to 8 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1 m²/g and 95% of the temazepam having a particle size of less than 65 microns.

2. A method of treating insomnia in a human in need of said treatment which comprises administering orally to said human a temazepam formulation consisting essentially of 7.5 milligrams of crystalline temazepam having a surface area of from 0.65 to 1.1 m²/g and 95% of the temazepam having a particle size of less than 65 microns.

*    *    *    *    *

# CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing *Nonconfidential Brief for Defendants-Appellants* were caused to be served on July 5, 2013, on counsel listed below by FedEx, next-day delivery, by electronic mail, and by the CM/ECF system:

> JOHN D. GARRETSON
> PETER E. STRAND
> REBECCA J. SCHWARTZ
> *Shook, Hardy & Bacon LLP*
> *2555 Grand Boulevard*
> *Kansas City, Missouri 64108-2613*
> *(816) 474-6550*
> *jgarretson@shb.com*
> *pstrand@shb.com*
> *rschwartz@shb.com*

Dated:  JULY 5, 2013                    */s/ Steffen N. Johnson*
                                         STEFFEN N. JOHNSON
                                         *Winston & Strawn LLP*
                                         *1700 K Street, N.W.*
                                         *Washington, D.C. 20006*
                                         *(202) 282-5000*
                                         *sjohnson@winston.com*

                                         *Counsel for Defendants-Appellants*
                                         *Mutual Pharmaceutical Company, Inc. and*
                                         *URL Research Laboratories, Inc.*

1

**CERTIFICATE OF COMPLIANCE**

I, Steffen N. Johnson, counsel for Defendants-Appellants, certify pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b) that this brief contains 14,000 words, as counted by Microsoft Word 2010. The text of the brief and footnotes are in 14-point Times New Roman font.


Dated: JULY 5, 2013          */s/ Steffen N. Johnson*
                             STEFFEN N. JOHNSON
                             *Winston & Strawn LLP*
                             *1700 K Street, N.W.*
                             *Washington, D.C. 20006*
                             *(202) 282-5000*
                             *sjohnson@winston.com*

                             *Counsel for Defendants-Appellants*
                             *Mutual Pharmaceutical Company, Inc. and*
                             *URL Research Laboratories, Inc.*